TJOFLAT, Circuit Judge:
Anyone who has ever made a purchase at a gas station, corner store, or shopping mall will not be shocked to learn that swiping a credit card is often more expensive than is paying with cash. What may be shocking to learn is that Florida makes it a second-degree misdemeanor for “[a] sellor or lessor in a sales or lease transaction” to “impose a surcharge on the buyer or lessee for electing to use a credit card,” Fla. Stat. § 501.0117(l)-(2), while the State expressly allows “the offering of a discount for the purpose of inducing payment by cash.” Id. § 501.0117(1). Tautologically speaking, surcharges and discounts are nothing more than two sides of the same coin; a surcharge is simply a “negative” discount, and a discount is a “negative” surcharge. As a result, a merchant who offers the same product at two prices — a lower price for customers paying cash and a higher price for those using credit cards — is allowed to offer a discount for cash while a simple slip of the tongue calling the same price difference a surcharge runs the risk of being fined and imprisoned.[1]
The First Amendment prevents staking citizens’ liberty on such distinctions in search of a difference. Florida’s no-surcharge law directly targets speech to indirectly affect commercial behavior. It does so by discriminating on the basis of the speech’s content, the identity of the speaker, and the message being expressed. Because the at-best plausible justifications on which the no-surcharge law rest provide no firm anchor, the law crumbles under any level of heightened First Amendment scrutiny. We, therefore, must strike down § 501.0117 as an unconstitutional abridgment of free speech.
I.
In 2014, four small businesses filed suit in the Middle District of Florida after receiving cease-and-desist letters from the Florida Attorney General demanding they refrain from certain business practices that, according to the Attorney General, ran afoul of the State’s no-surcharge law. Essentially, each of these businesses— which charged lower prices for customers using cash and higher prices for those using credit cards — wishes to express to their customers the price difference as an additional amount for credit-card use rather than a lesser amount for paying in cash.
Dana’s Railroad Supply, a family-run hobby shop in Spring Hill, received a cease-and-desist letter on March 15, 2013, after posting a sign indicating that its customers would be subject to a fee for using credit cards to make purchases. TM Jewelry LLC, a specialty jewelry store in Key West, received its letter on July 26, 2013, for communicating to customers that they faced an additional fee for the use of a credit card. Tallahassee Discount Furni *1240 ture, a retailer of discount furniture in Tallahassee, received its letter on July 8, 2018, having previously told customers that they faced a 2 percent surcharge for credit-card payments. And Cook’s Sport-land, an outdoor-sporting-goods store in Venice, received its letter on September 20, 2012, after having previously told customers that they faced a credit-card surcharge. Based on the belief that it is more effective, transparent, and accurate to do so, all four of the businesses wish to call the price difference a credit-card surcharge rather than a cash discount.
These businesses, plaintiffs below and appellants here, filed their complaint on March 5, 2014, presenting two claims for relief under 42 U.S.C. § 1983. First, they alleged that Florida’s no-surcharge law violates the First Amendment as an unjustified restriction on speech. Second, they alleged that the law provides insufficient guidance on how to comply with its mandates, and is therefore void for vagueness. The Attorney General moved to dismiss. The businesses responded by moving for summary judgment.
On September 2, 2014, the District Court granted the Attorney General’s motion, dismissing with prejudice the businesses’ complaint. Because the court held that the no-surcharge law is a “[rjestriction[] on pricing” that fell within “the Florida Legislature’s broad discretion in regulating economic affairs,” it subjected the law to rational-basis review.
The District Court hypothesized three possible justifications for the no-surcharge law.[2] First, the court considered an anti-fraud rationale viewing the no-surcharge law as. designed to prevent “bait and switch” tactics. That is, the law could be aimed at preventing merchants from “initially communicating only the lower price — the cash price” and then later charging a higher price — the credit-card price. Second and relatedly, the court turned to a notice rationale that perhaps the no-surcharge law prevents “unpleasant surprises” not rising to the level of a full-blown bait and switch. Finally, the court entertained a fairness rationale whereby no merchant would have the discretion to impose credit-card surcharges, preventing “competitive disadvantage” in the marketplace.
The District Court concluded that, though none of these justifications are “compelling” and “might not even be persuasive,” the no-surcharge law nonetheless survives rational-basis review.[3] Notably, the District Court declined to apply any level of First Amendment scrutiny despite its understanding that “the difference between a cash discount and a credit-card surcharge makes no difference in the price a customer must pay” and that the effect *1241 of the no-surcharge law is “a matter of semantics, not economics.”
The businesses appealed. We now reverse.
II.
Before addressing the merits, we briefly address the Attorney General’s argument that we lack jurisdiction to hear a portion of this appeal. The “irreducible constitutional minimum of standing” requires litigants in federal court to demonstrate: (1) that they suffered an “injury in fact,” which is a “concrete and particularized” and “actual or imminent” legally cognizable harm; (2) that a “causal connection” exists between the injury in fact and the opposing party’s conduct; and (3) that the injury “will be redressed by a favorable decision.” See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-62, 112 S.Ct. 2130, 2135-37, 119 L.Ed.2d 351 (1992) (citations and quotation marks omitted). When First Amendment protections are implicated, we apply “most loosely” the injury-in-fact requirement “lest free speech be chilled.” Harrell v. The Fla. Bar, 608 F.3d 1241, 1253-57 (11th Cir.2010).
The businesses have properly alleged standing on their free-speech claim. Each business has been injured by the receipt of a cease-and-desist letter from the Attorney General threatening enforcement action, which could result in fíne or imprisonment; that action is, and any future enforcement action would be, directly traceable to the State of Florida; and a declaration by this court that the no-surcharge law is unconstitutional will remedy the businesses’ harm. The businesses’ harm is sufficiently particularized and imminent, and the likelihood of their speech being chilled is sufficiently great, for review by this court.
Nor are the businesses barred from pursuing their void-for-vagueness claim because they seek pre-enforcement review. The general rule provides that litigants can raise void-for-vagueness challenges only as a defense during an actual prosecution because that defense turns on whether the State provided fair warning, as a matter of due process, to the litigants that their conduct would expose them to liability. Bankshot Billiards, Inc. v. City of Ocala, 634 F.3d 1340, 1348-50 (11th Cir.2011). “Litigants may not comb the statute books for poorly drafted laws and sue to enjoin their enforcement.” Id. at 1349. Litigants who are being “chilled from engaging in constitutional activity,” however, suffer a discrete harm independent of enforcement, and that harm creates the basis for our jurisdiction. Id. at 1349-50. Here, though the businesses properly raised it, we need not reach the void-for-vagueness issue because any reasonable construction of Florida’s no-surcharge law fails any level of heightened scrutiny.
With our jurisdiction established, we proceed to the merits.
III.
This appeal presents a pure question of law: the facial validity of Florida’s no-surcharge law under the First Amendment to the United States Constitution. Our review is de novo. Burk v. Augusta-Richmond Cty., 365 F.3d 1247, 1250 (11th Cir.2004).
The fate of Florida’s no-surcharge law hinges on a single determination: whether the law regulates speech— triggering First Amendment scrutiny — or whether it regulates conduct — subject only to rational-basis review as a mine-run economic regulation. The First Amendment provides, in relevant part, that “Congress *1242 shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I.[4] Laws passed by the federal or state governments that restrict, compel, or silence speech are disfavored, and presumptively unconstitutional. See United States v. Alvarez, 567 U.S. -, -, 132 S.Ct. 2537, 2543-44, 183 L.Ed.2d 574 (2012); Wooley v. Maynard, 430 U.S. 705, 714-15, 97 S.Ct. 1428, 1435-36, 51 L.Ed.2d 752 (1977). By contrast, legislatures are given wide latitude to “balance the advantages and disadvantages” when choosing whether and how to regulate commercial behavior. See Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 487-88, 75 S.Ct. 461, 464-65, 99 L.Ed. 563 (1955).
To make the dispositive speech-conduct determination, we turn first to the text of the statute. Harry v. Marchant, 291 F.3d 767, 770 (11th Cir.2002) (en banc). We do not lightly make the decision to strike down laws passed by the people through their democratically accountable representatives. Bound as all human communication is by the confines of language, legislatures will at times enact statutes capable of sustaining multiple interpretations. Cognizant of this reality, before holding that a statute violates the Constitution we therefore look to “reasonable” alternative constructions. Nat'l Fed’n of Indep. Bus. v. Sebelius, 567 U.S. -, -, 132 S.Ct. 2566, 2593-94, 183 L.Ed.2d 450 (2012). At times, this means that we will adopt saving interpretations of constitutionally dubious laws that are not “the most natural.” Id. at -, 132 S.Ct. at 2594. We will not, however, contort, disfigure, or vitiate a law’s plain meaning and readily discerned purpose merely for the sake of statutory preservation. See, e.g., George Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933) (Cardozo, J.) (“But avoidance of a [constitutional] difficulty will not be pressed to the point of disingenuous evasion.”).
Proceeding to the matter at hand, the relevant language of the no-surcharge law provides:
(1) A seller or lessor in a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card. A surcharge is any additional amount imposed at the time of a sale or lease transaction by the seller or lessor that increases the charge to the buyer or lessee for the privilege of using a credit card to make payment.
This section does not apply to the offering of a discount for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card, if the discount is offered to all prospective customers.
(2) A person who violates the provisions of subsection (1) is guilty of a misdemeanor of the second degree, ...
Fla. Stat. § 501.0117 (emphasis added).[5] As a second-degree misdemeanor, the no- *1243 surcharge law exposes violators to the possibility of sixty days’ imprisonment and a $500 fine. See id. §§ 501.0117, 775.082(4)(b), 775.083(l)(e).
Attempting to read Florida’s no-sur-eharge law as a regulation of economic conduct rather than as a restriction on speech casts the judicial Theseus into the depths of a lexical labyrinth. Given the potential for confusion, we find our bearings by beginning with what the no-surcharge law does not do before explaining what it does do. We conclude that no saving effort, however valiant, can overcome the clear thrust of the statute’s plain meaning.
The statute might appear at first blush to ban merchants from engaging in dual-pricing. That is, it would prohibit merchants from charging different prices to different customers depending on whether payment is made in cash[6] or by credit card. Yet, by the statute’s own terms, that cannot be. Merchants are expressly allowed to offer a “discount for the purpose of inducing payment by cash.” Fla. Stat. § 501.0117(1). The ordinary meaning of discount — there is no statutory definition — is a “deduction (typically a certain percentage) made from a price or an amount due.” Discount, Oxford English Dictionary (2015); Redus Fla. Commer-dal, LLC v. Coll. Station Retail Ctr., LLC, 111 F.3d 1187, 1191 (11th Cir.2014) (“Generally, words are interpreted with their ordinary and plain meaning because we assume that [the legislature] uses words in a statute as they are commonly understood.” (citation, quotation marks, and alterations omitted)). Notably, this sense of discount is used especially when “the deduction made from a price or an amount due” is so made “in return for prompt or early payment, or payment in cash.” Id. (emphasis added). The connection between lower prices and payments made in cash — as well as the corollary between higher prices and payments made by credit card — is a commonsense reality. The parties neither advance, nor do we find, any basis to call into question the continued propriety of this state of affairs.
If the no-surcharge law does not ban dual-pricing, we presume that it does something else. See Bouchard Transp. Co., Inc. v. Updegraff, 147 F.3d 1344, 1351 (11th Cir.1998) (“[W]e avoid statutory constructions that render provisions meaningless”). Perhaps the statute instead bans the selective raising of previously announced prices “imposed at the time of a sale” for credit-card users. Fla. Stat. § 501.0117(1). That is, perhaps the stat *1244 ute is only a prohibition on bait-and-switch schemes. Under this reading of the no-surcharge law, a merchant could charge customers different rates based on their method of payment, but could charge a higher price to credit-card users only if that price is announced before the transaction occurs.
The anti-bait-and-switch construction, however, fares no better than reading the statute as a complete bah on dual-pricing. We reject this construction because it would narrow the no-surcharge law into nothingness. All a merchant need do to avoid liability would be to announce to potential customers the price difference in advance of any sale. Assuming proper notice had been given, credit-card surcharges could be declared with. impunity on signs, on price tags, as a line item on receipts, and in response to credit-card-wielding customers’ questions as to why they are being charged more than their cash-flush peers. Under this strained reading, even the cheeky merchant who hung a sign on the till that read “You, the buyer, will have a surcharge imposed on the price of your purchase if you elect to use a credit card in lieu of payment by cash” — complete with citation to Fla. Stat. § 501.0117 — would get off scot-free.
Our conclusion rejecting this alternative construction is bolstered by the Attorney General’s own reading of the no-surcharge law. Not only did the Attorney General disavow such a narrow reading of the statute in her brief and at oral argument, but there is also no indication in the record that any of the businesses’ purportedly illegal surcharges referenced in the cease- and-desist letters were concealed from their customers until the point of sale. Indeed, the letter directed to Dana’s Railroad Supply was issued in response to the decision to post a sign announcing its policy of imposing credit-card fees. Moreover, construing the statute as a bait-and-switch offense would cover only conduct already covered by the Florida Deceptive and Unfair Trade Practices Act, the State’s unfair-competition law. Fla. Stat. §§ 501.201-501.213; see also Dep’t of Legal Affairs v. Rogers, 329 So.2d 257, 265-67 (Fla.1976). Without any textual or contextual indication that the Florida Legislature intended the no-surcharge law to function solely as a backstop to its unfair-competition law, we decline to read the law contrary to its plain meaning.[7]
*1245 Having considered and rejected these alternative constructions, we are left with the conclusion that the Florida Legislature meant what it said in its no-surcharge law: merchants can engage in dual-pricing so long as they offer only cash discounts, while credit-card surcharges are verboten. In order to violate the statute, a defendant must communicate the price difference to a customer and that communication must denote the relevant price difference as a credit-card surcharge. Calling § 501.0117 a “no-surcharge law,” then, is something of a misnomer. The statute targets expression alone. More accurately, it should be a “surcharges-are-fine-just-don’t-call-them-that law.”
After all, what is a surcharge but a negative discount? If the same copy of Plato’s Republic can be had for $30 in cash or $32 by credit card, absent any communication from the seller, does the customer incur a $2 surcharge or does he receive a $2 discount ? Questions of metaphysics aside, there is no real-world difference between the two formulations. Accordingly, Florida’s no-surcharge law is a restriction on speech, not a regulation of conduct. Cf. Rumsfeld v. Forum for Acad. and Inst. Rights, Inc., 547 U.S. 47, 60-62, 126 S.Ct. 1297, 1307-09, 164 L.Ed.2d 156 (2006) (holding that laws that neither “limit[ ] what [people] may say nor require[ ] them to say anything” regulate conduct, not speech).
To more fully understand why the statute restricts speech, rather than regulates conduct, imagine the following. Ostensibly worried about customers’ dining experiences being adversely affected by their unquenched thirst, a state makes it a crime for restauranteurs to serve half-empty beverages. Restauranteurs are, however, expressly allowed to serve half-full beverages. The state has no greater regulatory scheme requiring restaurants to provide beverage refills, nor does it even require that beverages be served at all. Would we say that what the state has done merely regulates the economic affairs of the food-service industry? Of course not. Liability for violating this glass-half-full mandate turns solely on the restauranteurs’ choice of words. It is therefore a restriction of speech, not conduct. And it is a restriction that discriminates against expression on the basis of content — dictating what restauranteurs ean talk about— as well as on the basis of viewpoint— dictating how restauranteurs can speak about those subjects.
We see no legally salient difference between a glass-half-full mandate and Flori *1246 da’s no-surcharge law. Both govern only how to express relative values,[8] imposing criminal liability for making the “wrong choice” between equally plausible alternative descriptions of an objective reality. Given our abhorrence of putting citizens of a free society to such “choices,” laws that restrict speech in this fashion must overcome the robust protections of the First Amendment.
rv.
Having decided that Florida’s no-surcharge law triggers First Amendment scrutiny as a restriction on speech, we turn next to what level of scrutiny it must face. Content-based restrictions on speech “are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.” Reed v. Town of Gilbert, 576 U.S. -, -, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015) (citations omitted). A restriction on speech is content based if it “applies to particular speech because of the topic discussed or the idea or message expressed.” Id. at -, 135 S.Ct. at 2227.
As is so often true, the general rule that content-based restrictions trigger strict scrutiny is not absolute. Content-based restrictions on certain categories of speech such as commercial and professional speech, though still protected under the First Amendment, are given more leeway because of the robustness of the speech and the greater need for regulatory flexibility in those areas. See, e.g., Sorrell v. IMS Health Inc., 564 U.S. -, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011) (commercial speech); Wollschlaeger v. Governor of Florida, 797 F.3d 859 (11th Cir.2015) (professional speech). For these categories of speech, the inquiry is the more flexible, yet still searching, standard of intermediate scrutiny. See Cent. Hudson Gas v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) (describing the test for commercial speech); Wollschlaeger, 797 F.3d at 893-97 (applying the same test to professional speech). Under intermediate scrutiny “restrictions directed at commerce or conduct” may be upheld — assuming they further a substantial government interest and are narrowly tailored — even if they “im-poste] incidental burdens on speech.” Sorrell, 564 U.S. at -, 131 S.Ct. at 2664-65.
Florida’s no-surcharge law proves difficult to categorize, skirting the line between targeting commercial speech and restricting speech writ large. We need not, however, decide on which side of that line the statute ultimately falls because it collapses under any level of heightened scrutiny. Cf. id. at -, 131 S.Ct. at 2667 (declining to specify the level of “heightened scrutiny” applied when the challenged law would fail under either possible standard). Thus, we analyze the no-surcharge law under the more-forgiving standard of intermediate scrutiny, which it nonetheless fails.
A.
Commercial speech is a narrow category of necessarily expressive communication that is “related solely to the economic interests of the speaker and its audience,” Cent. Hudson, 447 U.S. at 561, 100 S.Ct. at 2349, or that “does ‘no more than propose a commercial transaction.’ ” *1247 Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (quoting Pittsburgh Press Co. v. Human Relations Comm’n, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)). Though inextricably linked to underlying economic conduct, commercial speech has long been given limited First Amendment protection based on society’s “strong interest in the free flow of commercial information,” which is an “indispensable” prerequisite for creating the “intelligent and well informed” consumers needed to “preserve a predominantly free enterprise economy.” Id. at 764-65, 96 S.Ct. at 1827. With the core concerns of autonomy and the public availability of information in mind, we disregard any potential state interest that would “keep[ ] the public in ignorance” for their own good because such “paternal-is[m]” is abhorrent to the First Amendment. See id. at 770, 96 S.Ct. at 1829. That is not to suggest, of course, that the government may not fiercely advocate for its own world view. “But a State’s failure to persuade does not allow it to hamstring the opposition.” Sorrell, 564 U.S. at -, 131 S.Ct. at 2671.
Florida’s no-surcharge law clearly touches on economic activity. On its face, the law appears to regulate businesses engaged in dual-pricing, applies to “[a] sellor or lessor in a sales or lease transaction,” turns on the method of payment used, and defines the offense as occurring “at the time of a sale or lease transaction.” Fla. Stat. § 501.0117. There can be no doubt that the no-surcharge law has the flavor of commercial speech.
Yet the law’s taste is muddled by less savory notes of plain old-fashioned speech suppression. The statute goes to great length to avoid direct regulation of any actual conduct — that is, it fails to limit at all merchants’ discretion to engage in dual-pricing — in favor of limiting speech alone. And the speech it limits contains elements of core political speech.[9] By effectively purging from merchants’ vocabularies the doubleplusungood surcharge and replacing it with the State’s preferred term, discount, the constituency most impacted by the no-surcharge law has been deprived of its full rhetorical toolkit. See Cohen v. California, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) (“[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views.”). In turn, Florida’s no-surcharge law deprives the marketplace of ideas of the full range of public sentiment.
Moreover, its extraordinary breadth suggests the no-surcharge law is more than a, mere regulation of commercial speech. A law enacted for the sole purpose of forbidding a price difference to be labelled a surcharge, while allowing the *1248 same to be called a discount, does not impose an “incidental burden” on speech. Sorrell, 564 U.S. at -, 131 S.Ct. at 2664-65. On the contrary, imposing a direct and substantial burden on disfavored speech — by silencing it — is the whole point. The no-surcharge law is content based: it applies only to how a merchant may frame the price difference between cash and credit-card payments. See Reed, 576 U.S. at -, 135 S.Ct. at 2227. The no-surcharge law is speaker based: it applies only to those merchants who accept payment by both cash and credit card and engage in dual-pricing. See Turner Broad. Sys., Inc. v. Fed. Commc’ns Cmm’n, 512 U.S. 622, 657-58, 114 S.Ct. 2445, 2466-67, 129 L.Ed.2d 497 (1994). And the no-surcharge law is viewpoint based: it denies the expression of one equally accurate account of reality in favor of the State’s own. See R.A.V. v. City of St. Paul, 505 U.S. 377, 391, 112 S.Ct. 2538, 2547-48, 120 L.Ed.2d 305 (1992).
Viewpoint-based restrictions on speech are among governments’ most insidious methods of eliminating unwelcome opinion. As such, they warrant the greatest level of First Amendment protection. Ceding to any government the power to police expression on the basis of its message poses the most obvious threat to Americans’ most fundamental liberties: the freedom of speech and the freedom of conscience. “If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) (Jackson, J.). The exacting standard of strict scrutiny stands as sentinel against the diminution of that liberty. Appropriately tailored regulations of commercial speech — such as those imposing limits on lawyers’ ability to make in-person solicitations or advertise using direct mailings after a personal injury has occurred, see Fla. Bar v. Went For It, Inc., 515 U.S. 618, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995)— will necessarily target specific content and speakers. See Wollschlaeger, 797 F.3d at 894-96. But merely wrapping a law in the cloak of “commercial speech” does not immunize it from the highest form of scrutiny due government attempts to discriminate on the basis of viewpoint.
The Sixth Circuit faced a similar “hybrid” law “that implicates commercial and political speech” in BellSouth Telecomm., Inc. v. Farris, 542 F.3d 499 (6th Cir.2008). In that case, Kentucky had passed a law requiring that telecom providers collect a tax from their customers while forbidding the providers from directly collecting the tax and from communicating to consumers any additional charges as a “tax.” See id. at 501 (citing Ky.Rev.Stat. Ann. § 136.616 (2005)). Given the dual nature of Kentucky’s “no-stating-the-tax clause” — a law “that draws its heritage as much from protests over the Townshend Acts as from the Wealth of Nations ” — Judge Sutton, writing for the majority, confessed having “difficulty in placing a label on the law.” Id. at 504-06. As Judge Sutton astutely observed in his discussion of the challenged provision, though, “what is going on here is more than just a debate about how best to sell toothpaste.” Id. at 505. Ultimately, the court concluded that it could “save the issue for another day” because the challenged law “does not survive even the less-stringent intermediate level of scrutiny applicable to commercial speech.” Id.
We find the Sixth Circuit’s approach in Farris a prudent one. We will therefore analyze Florida’s no-surcharge law as if it *1249 were commercial speech because it crumbles under even this lower form of heightened scrutiny. Accordingly, were the no-surcharge law subject to strict scrutiny, it would likewise fail.
B.
Turning to the commercial-speech analysis, we make short shrift of Florida’s no-surcharge law. The constitutionality of regulations on commercial speech is assessed under the four-part Central Hudson test, which asks the following questions. First, does the challenged law regulate speech that is “neither misleading nor related to unlawful activity”? Second, does the government have a “substantial interest” at stake? Third, does the law “directly advance” the government’s interest? Fourth, would “a more limited restriction” be insufficient for that interest to “be served as well”? Cent. Hudson, 447 U.S. at 564, 100 S.Ct. at 2350. If a law can go four for four, it passes constitutional muster. If not, the challenged law unconstitutionally hampers speech.
Florida’s no-surcharge law founders at every step of this inquiry. To start, we reject the Attorney General’s notion that the no-surcharge law circumvents the commercial-speech inquiry altogether because it restricts speech as part of addressing an “illegal course of conduct.” Reasoning that the no-surcharge law “at minimum regulates some conduct,” it therefore outlaws speech only as “part of an integrated course of conduct” and the targeted speech did not need to “be prohibited by some independent law.” We reject any notion that merely because some modicum of economic conduct is implicated therefore a law cannot also unconstitutionally restrict speech. The First Amendment is not so easily circumvented. And, in any event, the no-surcharge law does not sweep up only speech that is incidental and necessary to the enforcement of another important state interest; speech is the only behavior being targeted. Cf. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 690, 93 L.Ed. 834 (1949) (“But [speech] used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from state control”).
Nor is the no-surcharge a regulation of misleading speech. Calling the additional fee paid by a credit-card user a surcharge rather than a discount is no more misleading than is calling the temperature warmer in Savannah rather than colder in Esca-naba. Florida’s no-surcharge law thus does not target false or misleading speech. Because, as discussed above, the no-surcharge law regulates speech and not conduct, we continue to the second Central Hudson prong.
We struggle to identify a plausible governmental interest that would be served by the no-surcharge law, much less one that could be considered substantial. The candidate advanced by the Attorney General — a generalized interest in “consumer protection” — is formulated too abstractly to provide a meaningful benchmark for weighing the no-surcharge law against the State’s purported interest. The three potential interests hypothesized by the District Court, though more concrete, likewise prove unavailing. First, the law may serve as an antifraud measure against bait-and-switch tactics, whereby a merchant advertises a lower price only to later charge a higher price. Second and relat-edly, the law may be viewed as a prophylactic measure that protects consumers against “unpleasant surprises” that do not rise to the level of fraud. Finally, the law may be seen as leveling the playing field among merchants, some of whom may oth *1250 erwise select a policy of assessing credit-card surcharges while others opt for cash discounts.
We conclude, as did the District Court, that “[n]one of these assertions is compelling” and go a step further to confirm the court’s suspicion that they are “not even ... persuasive.” Our conclusion that the foundation provided by such interests is nothing more than shifting sand is underscored by the fact that Florida has exempted certain state agencies from its no-surcharge law — allowing them to charge “convenience fees” for the privilege of using a credit card, Fla. Stat. § 215.322(2), (3)(b) — without advancing any relevant distinction between private merchants and state agencies that references the asserted interests being served. If customers would be harmed by learning that they faced surcharges but not discounts from private merchants, creating an exception allowing the State to impose convenience fees betrays the frailty of any potential state interests.[10] Even should we assume that one or more of these rationales formed a “substantial” government interest, the no-surcharge law proves too broad and too blunt a means to its ends.
Considering the third and fourth Central Hudson prongs together, the no-surcharge law neither directly advances any potentially substantial state interest nor is it narrowly tailored. Any of the asserted interests — preventing bait-and-switch tactics, providing advance notice to customers, and levelling the playing field among merchants — would be better served by direct and focused regulation of actual pricing behavior. Florida could simply prohibit dual-pricing altogether. Or it could cap the difference in price that can be charged to customers paying with cash and those using credit cards, just as it has done for the use of credit cards at state agencies and for the use of a “money transmitter service.” [11] See Fla. Stat. §§ 215.322(3)(b), 560.208(2). Or it could ban specific false and deceptive trade practices, such as bait- and-switch tactics, as it does generally for acts of unfair competition under the State’s Deceptive and Unfair Trade Practices Act. Fla. Stat. §§ 501.201-501.213. Or it could require merchants to disclose to their customers the workings of their pricing policy. See Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 650-51, 105 S.Ct. 2265, 2281-82, 85 L.Ed.2d 652 (1985) (upholding disclosure requirements of “purely factual and uncontroversial information” that “are reasonably related to the State’s interest in preventing deception of consumers”). The available less strict-restrictive alternatives are legion. What Florida cannot do, as a constitutional matter, is what its no-surcharge law does: abridge protected *1251 speech. The no-surcharge law, therefore, fails intermediate scrutiny.
Finally, we conclude by highlighting the extraordinary nature of Florida’s no-surcharge law and the modest scope of our holding. We rule today only on a law that, though it purports to regulate commercial behavior, has the sole effect of banning merchants from uttering the word surcharge, criminalizing speech that is neither false nor misleading. The First Amendment does not return us to the heyday of Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). Laws that target real-world commercial activity need not fear First Amendment scrutiny. Such run-of-the-mill economic regulations will continue to be assessed under rational-basis review.
The First Amendment does not, however, allow the Government to directly restrict speech in an attempt to control conduct in response to that speech. Paternalistic efforts at social engineering are anathema to constitutional first principles. As the-District Court correctly observed, a criminal prohibition on credit-card surcharges that nevertheless allows for cash discounts “is a matter of semantics, not economics.” Though our Constitution does not dictate an economic orthodoxy— Spencerian or otherwise, see Lochner, 198 U.S. at 75, 25 S.Ct. at 546 (Holmes, J., dissenting) — it does care a great deal about “semantics.” A free marketplace of ideas abhors command and control, and will accommodate regulatory needs of only the highest order. By holding out discounts as more equal than surcharges, Florida’s no-surcharge law overreaches to police speech well beyond the State’s constitutionally prescribed bailiwick. For that reason, we conclude that § 501.0117 is an unconstitutional abridgment of free speech.
V.
Accordingly, we REVERSE the District Court’s grant of summary judgment to the Attorney General and REMAND for further proceedings consistent with this opinion.
REVERSED AND REMANDED.

. Violators of Florida’s no-surchárge law face the possibility of a $500 fíne and sixty days’ imprisonment. Fla. Stat. §§ 501.0117, 775.082(4)(b), 775.083(l)(e).

. Before the District Court, the Attorney General advanced only a generalized and cursory interest in "protecting consumers.” And the Attorney General declines to elaborate on the State’s purported interest on appeal. We will therefore adopt the three potential justifications identified by the District Court.

. To the extent that the District Court speculated the no-surcharge law could have survived intermediate scrutiny, we find that musing to be mere dictum, rather than an alternative holding. The entirety of the court’s speculation on this front consists of the following: "And if [the no-surcharge law] were viewed as a restriction on commercial speech, the outcome would be the same.” An offhand comment that lacks substantiating reasoning is exactly the sort of judicial statement we recognize as lacking any authoritative weight. See, e.g., Denno v. Sch. Bd. of Volusia Cty., Fla., 218 F.3d 1267, 1283 (11th Cir.2000) ("Dictum may be defined as 'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.' ” (citation omitted)).

. The First Amendment, despite its express language, has long since been incorporated against the several states under the Due Process Clause of the Fourteenth Amendment. See Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 629-30, 69 L.Ed. 1138 (1925).

. In its entirety, Florida's no-surcharge law provides:
il) A seller or lessor in-a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card. A surcharge is any additional amount imposed at the time of a sale or lease transaction by the seller or lessor that increases the charge to the buyer *1243 or lessee for the privilege of using a credit card to make payment. Charges imposed pursuant to approved state or federal tariffs are not considered to be a surcharge, and charges made under such tariffs are exempt from this section. A convenience fee imposed upon a student or family paying tuition, fees, or other student account charges by credit card to a William L. Boyd, IV, Florida resident access grant eligible institution, as defined in s.1009.89, is not considered to be a surcharge and is exempt from this section if the amount of the convenience fee does not exceed the total cost charged by the credit card company to the institution. The term “credit card” includes those cards for which unpaid balances are payable on demand. This section does not apply to the offering of a discount for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card, if the discount is offered to all prospective customers.
(2) A person who violates the provisions of subsection (1) is guilty of a misdemeanor of the second degree, punishable as provided in s.775.082 ors.775.083.
Fla. Stat. § 501.0117.

. Though the statute also allows for discounts if customers pay with cash equivalents such as personal checks, we refer to these collectively as cash for the sake of convenience and clarity.

. The dissent faults us for rejecting the anti-bait-and-switch construction. Because the statute defines surcharge as "any additional amount imposed at the time of a sale,” the dissent argues that this temporal limitation provides a reasonable, constitutionally viable alternative of Florida's no-surcharge law as a regulation of conduct, not speech. Fla. Stat. § 501.0117(1). Remarkably, this "is not only a ‘fairly possible’ interpretation, it is also the most natural one.” Dissent at 1256.
Not so. The dissent’s position is essentially that Florida's no-surcharge law can be saved by grafting onto the definition of surcharge a notice requirement that would enable a merchant to “speak in any way he chooses so long as he does not ambush the credit-card-using customer with a higher price at the register.” Id. at 1252. But the dissent puts far too much stock in the "at the time of sale” language. Read in full, the statutory definition provides: “A surcharge is any additional amount imposed at the time of a sale or lease transaction by the seller or lessor that increases the charge to the buyer or lessee for the privilege of using a credit card to make payment." § 501.0117(1) (emphasis added).
As we understand the dissent's position, the merchant who hangs a sign on the register announcing a generally applicable surcharge for all credit-card sales need not fear prosecution under § 501.0117 because customers, armed with notice prior to the time of sale, would not fall prey to commercial "ambush.” Similarly immune from liability, however, would be the deceitful huckster who kept his mouth shut and added $5 to a customer’s bill unless a prosecutor could show that the additional amount was imposed "for the privilege of using a credit card” rather than for naked *1245 pecuniary gain — a dubious proposition, at best. Under the dissent’s preferred anti-bait- and-switch construction, then, the only scenario in which § 501.0117 applies would be where a merchant gave no prior warning about an additional charge whatsoever and somehow expressed that the charge was "for the privilege of using a credit card” at the time of a sale. It strains credulity that it was this vanishingly small, perhaps entirely fanciful, set of circumstances upon which the Florida Legislature fixed its attention in enacting the broadly sounding § 501.0117. And this strain is too much for the constitutional-doubt canon to bear.
Finally, we briefly address two other points raised by the dissent. First, the dissent is of course correct that we do not cede our authority over questions of law to parties’ litigation postures. That the Attorney General's understanding of Florida’s no-surcharge is out of sync with the dissent's preferred reading, though not controlling, strongly suggests the likely confusion about the statute’s meaning and enforcement that would follow from adopting an anti-bait- and-switch construction. Second, to the extent that § 501.0117 criminalizes only conduct that is already punishable civilly under the Florida Deceptive and Unfair Trade Practices Act, that should raise more First Amendment and Due Process concerns, not fewer.

. It may well be the case that economic consequences flow from what a cash-credit-price difference is called. Customers facing a price difference that is framed as a surcharge may be more willing to cough up cash than those presented with the same choice framed as a discount. As a legal matter, potential incidental effects, whether intended by the legislature or not, do not alter the fact that the no-surcharge law directly restricts speech.

. No-surcharge laws are not unique to Florida, and have a long and bitter political provenance. See generally Adam Levitin, Priceless? The Economic Costs of Credit Card Merchant Restraints, 55 UCLA L.Rev. 1321, 1363-92 (2008); see also Italian Colors Rest. v. Harris, No. 2:14-cv-00604-MCE-DAD, 99 F.Supp.3d 1199, 2015 WL 1405507 (E.D.Cal. Mar. 26, 2015), appeal docketed No. 15-15873 (9th Cir. Apr. 30, 2015) (holding unconstitutional California’s no-surcharge law); Roswell v. Petti-john, No. 1:14-cv-00190-LY, 2015 U.S. Dist. LEXIS 40739 (W.D.Tex. Feb. 4, 2015) (upholding Texas’s no-surcharge law). The Second Circuit, the only other circuit to confront a similar case, recently upheld New York's no-surcharge law based on a combination of Pullman abstention and a narrow reading of the relevant statutory text and legislative history, both of which differ from § 501.0117’s. See Expressions Hair Design v. Schneiderman, 803 F.3d 94 (2d Cir.2015).

. Specifically, Florida allows "state agencfies]” and "the judicial branch” to "accept credit cards, charge cards, debit cards, or electronic funds transfers in payment for goods and services.” Fla. Stat. § 215.322(2). If someone doing business with a state agency chooses to pay with a credit card or other enumerated means, the agency may "impose a convenience fee upon the person making the payment.” Id. § 215.322(3)(b). Given the State's posture in this litigation, it is more than ironic that state agencies are required to frame the additional amount charged to credit-card users as a convenience fee rather than as a cash discount.

. A "money transmitter” is defined as "a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire,'facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country.” Fla. Stat. § 560.103(23).