[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-12049
_____

D.C. Docket No. 4:14-cv-00621-RH-CAS

OCHEESEE CREAMERY LLC,

Plaintiff - Appellant,

versus

ADAM H. PUTNAM,
in his official capacity as Florida Commissioner of Agriculture,
ZACH CONLIN,
in his official capacity as Chief of Florida Bureau of Dairy Industry,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(March 20, 2017)

Before ROSENBAUM, BLACK and SENTELLE,[*] Circuit Judges.

BLACK, Circuit Judge:

Ocheesee Creamery, LLC (the Creamery) appeals the district court's grant of summary judgment to the Florida Commissioner of Agriculture and the Chief of the Florida Bureau of Dairy Industry, parties to this lawsuit in their official capacities (together, the State), and the court's denial of the Creamery's motion for summary judgment on the question of whether the State improperly forbade the Creamery from selling unfortified skim milk. The Creamery contends the State violated its First Amendment right to free speech by prohibiting the Creamery from using the words "skim milk" to describe its product. After review, we vacate the judgment of the district court.

## I.  BACKGROUND

The Creamery is a small dairy creamery located on its owners' farm in rural Calhoun County, Florida. It sells all-natural dairy items, including whole milk, cream, and related items such as ice cream. It also sells all-natural skim milk, which is a byproduct of its cream production. Consistent with standard practice, the Creamery produces cream by causing it to rise to the top of the milk and then

---

[*] Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia, sitting by designation.

skimming it off.  The leftover product is skim milk:  milk that has had the fat removed through skimming.

Incidentally, the skimming process depletes almost all the vitamin A naturally present in whole milk because vitamin A is fat-soluble and is thus removed with the cream.  Vitamin A levels can be restored by introducing an additive to the resulting skim milk.  The Creamery prides itself on selling only all-natural, additive-free products, and therefore refuses to replace the lost vitamin A in its skim milk.  Its product contains no ingredients other than skim milk.  The Creamery only sells its skim milk in Florida.[1]

Florida law prohibits the sale of milk and milk products that are not Grade "A," which requires, among other things, that vitamin A lost in the skimming process must be replaced.  *See* Fla. Stat. § 502.091 ("Only Grade 'A' pasteurized milk and milk products . . . shall be sold at retail to the final consumer."); Fla. Stat. § 502.014(5) (authorizing Florida Department of Agriculture to adopt rules); Fla. Admin. Code r. 5D-1.001(1) (adopting and incorporating by reference "Grade A Pasteurized Milk Ordinance ('PMO'), 2005 Revision, Public Health Service/Food and Drug Administration, its Appendices and notes"); U.S. Dep't of Health & Human Servs., *Grade "A" Pasteurized Milk Ordinance*, at App'x O (2005) ("[V]itamins A and D must be added to dairy products from which fat has been

---

[1] This case concerns only its intrastate sales and no challenge is made to any federal action or regulation.

3

removed; such as, reduced fat, lowfat, and nonfat dairy products, in an amount necessary to replace the amount of these vitamins lost in the removal of fat."). The Creamery sold its skim milk in Florida for nearly three years, beginning in 2010. In October 2012, the State issued two stop sale orders with respect to the Creamery's skim milk, stating the milk lacked vitamin A. That left the Creamery with two alternatives: add vitamin A to its skim milk or cease to sell the product. The Creamery opted for the latter and began discarding the skim milk left over from its cream production rather than incorporate the additives. Meanwhile, it attempted to procure a permit to sell the unenhanced milk under Florida's imitation milk statute. *See* Fla. Stat. § 502.165. The State began negotiating with the Creamery for the issuance of an imitation milk permit.

Initially, the State told the Creamery it could sell its product without adding vitamin A so long as it bore the label "imitation milk product," but the Creamery objected to describing its all-natural product this way. The Creamery and the State entered into discussions with the object of finding a more suitable label for the product that addressed the Creamery's concerns but did not mislead consumers into thinking the milk was Grade "A" skim milk with replenished vitamin A. By letter dated December 11, 2013, the State informed the Creamery that "Florida law provides that only Grade 'A' pasteurized milk and milk products shall be sold at retail within the state." It nevertheless added that it had "determined that Florida

4

law would allow [the Creamery] to offer this product for retail sale within the state" pursuant to the imitation milk statute if certain conditions were met, among them that the product label read as follows:  "Non-Grade 'A' Milk Product, Natural Milk Vitamins Removed."  Replying in September 2014, the Creamery insisted that the State's proposed label was misleading because the product was in fact skim milk, and should be labeled as such.  It submitted five alternative labels, each of which included the words "skim milk."[2]  The State responded on October 23, 2014, rejecting the Creamery's suggestions and insisting that the skim milk be sold under a different name.  It offered a counterproposal that mirrored one of the Creamery's suggestions except that it substituted the term "milk product" in place of "skim milk."[3]

---

[2] The Creamery offered the following labels: (1) "PASTEURIZED SKIM MILK, NO VITAMIN A ADDED;" (2) "PASTEURIZED SKIM MILK, NO LOST VITAMIN A REPLACED;" (3) "PASTEURIZED SKIM MILK, MOST VITAMIN A REMOVED BY SKIMMING CREAM FROM MILK;" (4) "NON-GRADE 'A' SKIM MILK, SOME MILK VITAMINS REDUCED BY SKIMMING CREAM FROM ALL-NATURAL PASTEURIZED MILK;" and (5) "THE STATE REQUIRES US TO CALL THIS: 'NON-GRADE "A" MILK PRODUCT, NATURAL MILK VITAMINS REMOVED.' IT IS ALL-NATURAL SKIM MILK WITH SOME VITAMIN A REMOVED BY SKIMMING CREAM FROM MILK."

[3] The State proposed the following label, based on the Creamery's earlier suggestion: "The State requires us to call this: 'Non Grade "A" Milk Product, Natural Milk Vitamins Removed.'  All natural milk product with vitamins removed by separating cream from milk."  In the Creamery's version, the second sentence used the term "skim milk" in place of "milk product."  The Creamery asserts in its initial brief that it would "happily use" a disclaimer stating that its skim milk does not have the same vitamins as whole milk.  Brief of Appellant at 21–22 & n.16.

5

Negotiations ceased and the Creamery filed its complaint on November 20, 2014, contending the State's refusal to allow it to call its product "skim milk" amounted to censorship in violation of the First Amendment.[4]  Cross-motions for summary judgment, responses, and replies were filed on June 22, July 27, and August 10, 2015, respectively.  The district court granted summary judgment in favor of the State on March 30, 2016.  It reasoned that it is inherently misleading to call a product "skim milk" if that product does not have the same vitamin content as whole milk.  The State's refusal to allow the Creamery to use the term "skim milk" thus withstood scrutiny under the threshold inquiry of the *Central Hudson* test for commercial speech regulations.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563–64, 100 S. Ct. 2343, 2350 (1980).  The

---

[4] The Creamery also asserted the State unconstitutionally compelled the Creamery to use a confusing and misleading label in violation of the First Amendment.  The district court ruled the issue was not ripe.  On appeal, however, the Creamery has only argued that the State has censored its use of the term "skim milk."  Although its statement of issues does mention the compelled speech claim, its brief does not argue the question.  The only mention of purportedly compelled labels (the Creamery is unspecific as to which labels the State allegedly forced it to use) takes place in furtherance of the Creamery's argument that the State's ban on the use of "skim milk" fails the last two prongs of *Central Hudson*, discussed *infra*.  To the extent it has actually asserted the compelled speech claim in this litigation, it has abandoned it by failing to argue it in its brief.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

In addition, the Creamery and the State nearly agreed on a proposed label, the only difference being that the State would have forbidden the use of the term "skim milk."  *See supra* n.3.  It is not clear a dispute over compelled speech would still exist, then, because there is no remaining disagreement about the label once we have determined whether the State may prohibit the Creamery from using the term "skim milk."

6

court also found that the regulation passed muster under the three remaining prongs of *Central Hudson* as well.

The sole issue on appeal is whether the State's actions prohibiting the Creamery's truthful use of the term "skim milk" violate the First Amendment.[5] We hold that they do.

## II. STANDARD OF REVIEW

"This court reviews *de novo* the question of whether state restrictions on commercial speech are constitutional." *Mason v. Fla. Bar*, 208 F.3d 952, 955 (11th Cir. 2000). In reviewing a grant of summary judgment, we apply the same

---

[5] Throughout the proceedings, the Creamery has litigated this case as an as-applied challenge, notwithstanding passing references to a facial challenge in its complaint. The Creamery appears to seek the narrowest as-applied relief available to it. *See Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) (distinguishing as-applied and facial challenges). It does not specifically cite the offending Florida statutes or regulations, nor explain how the statutes themselves are invalid; rather, its arguments concern only the State's treatment of the Creamery. *See* Complaint for Declaratory and Injunctive Relief at ¶ 6 ("Plaintiff Creamery seeks declaratory and injunctive relief against Florida restrictions on . . . the labeling of skim milk, as well as related actions taken by [the State]. These restrictions and requirements are found in Chapter 502, Florida Statutes, and Florida Administrative Code Chapter 5D-1."); *id.* at ¶¶ 80, 91 (challenging "Florida law and the action of [the State]"); Brief of Appellant at 11 ("The relevant Florida statutes are located in Chapter 502 and are supplemented by Florida Administrative Code Section 5D-1."); *id.* at 12 n.9 ("The meanings of these state statutes and state regulations are not in dispute, and the statutes and regulations themselves are long and complex. For a detailed explanation of the manner in which the numerous relevant state statutes and state regulations fit together, *see* [the Creamery's brief in support of its motion for summary judgment]."). The closest indication of which actual provisions of Florida law are at issue are found in the Creamery's memorandum of law accompanying its motion for summary judgment. There, it references Fla. Stat. §§ 502.165 and 502.181, which are Florida's imitation milk statute and general enforcement provisions, respectively. *See* Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at 6–7, 11. No argument has been advanced as to how these statutes are unconstitutional; the Creamery only disputes the State's refusal to allow it to use the term "skim milk." Thus the only challenge is to the action of the State with respect to the Creamery in this case, and our decision is limited to that issue.

standards as the district court and view all facts and reasonable inferences in the light most favorable to the nonmoving party.  *Borgner v. Brooks*, 284 F.3d 1204, 1208 (11th Cir. 2002) (citing *Parks v. City of Warner Robins*, 43 F.3d 609, 612–13 (11th Cir. 1995)).

## III. DISCUSSION

"Commercial speech, expression inextricably related to the economic interests of the speaker and audience, is undeniably entitled to substantial protection under the First and Fourteenth Amendments of the United States Constitution."[6]  *Mason*, 208 F.3d at 955 (collecting cases).  But it was not always so.  *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 505, 101 S. Ct. 2882, 2891 (1981) (plurality opinion) ("The extension of First Amendment protections to purely commercial speech is a relatively recent development in First Amendment jurisprudence.  Prior to 1975, purely commercial advertisements of services or goods for sale were considered to be outside the protection of the First Amendment." (citing *Valentine v. Chrestensen*, 316 U.S. 52, 62 S. Ct. 920 (1942))).  In *Virginia State Board of Pharmacy v. Virginia Consumer Council, Inc.*, 425 U.S. 748, 96 S. Ct. 1817 (1976), the Supreme Court decisively repudiated

---

[6] Commercial speech is "a narrow category of necessarily expressive communication that is related solely to the economic interests of the speaker and its audience . . . or that does no more than propose a commercial transaction."  *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1246 (11th Cir. 2015) (quotations omitted).  The parties agree the Creamery's use of the term "skim milk" to describe its product is commercial speech.

8

the notion that commercial speech receives no First Amendment protection.  *Id.*; *cf.*

*Valentine*, 316 U.S. at 54, 62 S. Ct. at 921 ("[T]he Constitution imposes no . . .

restraint on government as respects purely commercial advertising.").  Since that

decision and those that followed, some, but not all, commercial speech has been

held to be entitled to the protection of a form of intermediate scrutiny.

Challenges to restrictions on commercial speech are evaluated according to

the rubric set forth by the Court in *Central Hudson Gas & Electric Corp. v. Public

Service Commission.*[7]  447 U.S. 557, 100 S. Ct. 2343 (1980).  The *Central*

---

[7] There is some question as to whether under the Supreme Court's decisions in *Sorrell v. IMS Health Inc.* and *Reed v. Town of Gilbert* an analysis to determine if the restriction is content based or speaker focused must precede any evaluation of the regulation based on traditional commercial speech jurisprudence, and if so, whether this would alter the *Central Hudson* framework.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S. Ct. 2653 (2011); *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015).  In *Sorrell*, the Supreme Court found the restriction at issue to be content based but nevertheless cited, articulated, and applied the *Central Hudson* test.  *See Sorrell*, 564 U.S. at 572, 131 S. Ct. at 2667–68 ("To sustain the targeted, content-based burden § 4631(d) imposes on protected [commercial] expression, the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." (citing *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480–81 109 S. Ct. 3028, 3035 (1989); *Central Hudson*, 447 U.S. at 566, 100 S. Ct. at 2351)); *accord Dana's R.R. Supply*, 807 F.3d at 1246 ("Content-based restrictions on certain categories of speech such as commercial and professional speech, though still protected under the First Amendment, are given more leeway because of the robustness of the speech and the greater need for regulatory flexibility in those areas.").  And in *Reed*, the Court arguably broadened the test for determining whether a law is content based.  *See Reed*, 135 S. Ct. at 2227, 2230 (noting no exceptions in stating that laws that "single[ ] out specific subject matter" are facially content based and thus subject to strict scrutiny); *see also id.* at 2236–39 (Kagan, J., concurring in the judgment) (warning that the majority's approach glosses over exceptions in the Court's case law regarding the content-based determination).  This Court's recent decision in *Wollschlaeger v. Governor of Florida* underscores the uncertainty.  ___ F.3d ___, No. 12-14009, 2017 WL 632740 (11th Cir. Feb. 16, 2017) (en banc).  There, we determined that the regulations at issue were speaker focused and content based but ultimately applied intermediate scrutiny.  *Id.* at \*6–\*7, \*10–\*13 (citing and applying the *Central Hudson* line of cases, though not citing *Central Hudson* itself).  We need not wade into these troubled waters, however, because the State cannot

*Hudson* analysis consists of a threshold question followed by a three-prong test.[8] The threshold question asks "whether the expression is protected by the First Amendment" at all because, as noted above, some commercial speech remains unprotected. *Central Hudson*, 447 U.S. at 566, 100 S. Ct. at 2351. Commercial speech does not merit First Amendment protection and may be regulated or even banned if (1) the speech concerns unlawful activity or (2) the speech is false or inherently misleading. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 638, 105 S. Ct. 2265, 2275 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading or that proposes an illegal transaction." (citations omitted)); *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 849 (11th Cir.

---

survive *Central Hudson* scrutiny, and in any event the Creamery does not argue the State's restriction was content based or speaker focused. Brief of Appellant at 27 n.19.

[8] *Central Hudson* sometimes has been characterized as consisting of a four-prong test and other times as a three-prong test following a threshold question. *Compare Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624, 115 S. Ct. 2371, 2376 (1995) ("Commercial speech that falls into neither of those categories [misleading speech or speech concerning unlawful activity], like the advertising at issue here, may be regulated if the government satisfies a test consisting of three related prongs . . . ."), *and Harrell v. Fla. Bar*, 608 F.3d 1241, 1269–70 (11th Cir. 2010), *with City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 435, 113 S. Ct. 1505, 1519–20 (1993) (Blackmun, J., concurring) ("Under the analysis adopted by the *Central Hudson* majority, misleading and coercive commercial speech and commercial speech proposing illegal activities are addressed in the first prong of the four-part test."), *and Borgner v. Brooks*, 284 F.3d 1204, 1210 (11th Cir. 2002). We think *Central Hudson* is best characterized as consisting of a threshold question and a three-prong test, and we adopt this terminology throughout this opinion. The threshold question is really a separate inquiry, for it examines the *speech* to determine whether it is protected at all, whereas the three-prong test scrutinizes the *restriction* to ascertain whether it survives the intermediate scrutiny afforded to protected commercial speech. *But cf. Alexander v. Cahill*, 598 F.3d 79, 88 n.5 (2d Cir. 2010) (recognizing the terminological split but adopting the four-part locution).

1990) ("[C]ommercial speech, accorded lesser protection than other constitutionally guaranteed expression, may be banned if it relates to illegal activity." (citing *Central Hudson*, 447 U.S. at 563–64, 100 S. Ct. at 2350)); *Borgner*, 284 F.3d at 1210 ("Inherently misleading or false advertising . . . may be regulated by the state at will." (citing *In re R.M.J.*, 455 U.S. 191, 203, 102 S. Ct. 929, 937 (1982))).

If the speech neither concerns unlawful activity nor is inherently misleading, satisfying the threshold criterion and thus meriting First Amendment protection, then the government may only regulate the speech if its restriction satisfies intermediate scrutiny under *Central Hudson*'s three-prong test. In the first prong, "we ask whether the asserted governmental interest is substantial." *Central Hudson*, 447 U.S. at 566, 100 S. Ct. at 2351. In the remaining two prongs, "we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.* A regulation that fails to pass muster violates the First Amendment.

With respect to both the threshold question and the three-prong test, the burden is on the government to produce evidence to support its restriction. *Edenfield v. Fane*, 507 U.S. 761, 770, 113 S. Ct. 1792, 1800 (1993) ("It is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it." (quotation omitted)); *see also Ibanez v. Fla.*

11

*Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 143, 114 S. Ct. 2084, 2089 (1994) ("The State's burden is not slight; the 'free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful.'" (quoting *Zauderer*, 471 U.S. at 646, 105 S. Ct. at 2279)).  The requirement to produce evidence is essential, "otherwise 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Miller v. Stuart*, 117 F.3d 1376, 1382 (11th Cir. 1997) (quoting *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 487, 115 S. Ct. 1585, 1592 (1995)).  With these precepts in mind, we turn to *Central Hudson*.

 A. *Threshold Question*

      *1. Speech related to unlawful activity*

The first question under the threshold inquiry is whether the restriction is permissible as a regulation of speech relating to unlawful conduct.  The State asserts it is because the Creamery's skim milk is simply prohibited for sale in Florida.  If the only legal way to sell skim milk in Florida were to add vitamin A so that the milk met the standards for a Grade "A" milk product, then banning the use of the term "skim milk" for non-complying milk would be lawful as a restriction of

12

speech relating to the unlawful activity of selling non-Grade "A" milk.[9] *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24, 115 S. Ct. 2371, 2376 (1995) ("[T]he government may freely regulate commercial speech that concerns unlawful activity."); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389, 93 S. Ct. 2553, 2561 (1973) ("Any First Amendment interest which might be served by advertising an ordinary commercial proposal . . . is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity."); *Central Hudson*, 447 U.S. at 563–64, 100 S. Ct. at 2350; *see also Cable/Home Commc'n Corp.*, 902 F.2d at 849–50 (holding that copyright infringement suit against publisher of advocacy campaign newsletter advertising illegal de-scrambling devices does not violate First Amendment). Put another way, the State's action would be a regulation of illegal conduct, not speech. *See Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1241–46, 1249 (11th Cir. 2015) (finding a law that permitted a price differential to be charged to customers if called a discount but that prohibited such a disparity if referred to as a surcharge regulated speech rather

---

[9] If an imitation milk permit were unavailable for skim milk, it would simply be illegal to sell the milk without replenishing the lost vitamin A, because without additives the skim milk is not Grade "A" and as such cannot be sold in Florida. *See* Fla. Stat. § 502.091 ("Only Grade 'A' pasteurized milk and milk products . . . shall be sold at retail to the final consumer"); Plaintiff's Response to Defendant's Motion for Summary Judgment at 2 ("Defendants state that the fact the Creamery's skim milk 'is not Grade "A"' is an undisputed material fact in this case. This fact is indeed undisputed . . . .").

than conduct and was not exempt from *Central Hudson* scrutiny as a restriction on speech relating to illegal conduct).

However, the State and the Creamery agree that in Florida vitamin-deficient skim milk can lawfully be sold as "imitation" milk. Furthermore, the State demonstrated its willingness to issue an imitation milk permit to the Creamery subject to its desired labeling and has acknowledged throughout these proceedings that the Creamery's skim milk can be sold as imitation milk. Because all that is being challenged is the State's action with respect to the Creamery, we accept the State's contention.[10]

As a result, the State has presented the Creamery with two options given the Creamery's unwillingness to add vitamin A: (1) sell the milk (pursuant to the

---

[10] If it were illegal to sell skim milk without additives at all, then restricting the use of the words "skim milk" would be legitimate with respect to non-complying milk because such branding would constitute speech incidental to unlawful conduct. *See Went For It*, 515 U.S. at 623–24, 115 S. Ct. at 2376; *Pittsburgh Press*, 413 U.S. at 389, 93 S. Ct. at 2561. To that end, an argument could be made that under Florida law, the Creamery is not entitled to an imitation milk permit for its skim milk. *See* Fla. Stat. § 502.012(13) (defining "milk products" to include skim milk); *id.* § 502.012(10) (defining "imitation milk and milk products" as expressly excluding items that qualify as "milk products"); *id.* § 502.165(3) (authorizing permits for imitation milk and milk products). If the Creamery could not sell its skim milk as imitation milk, there would be no way around Florida's prohibition on the sale of non-Grade "A" skim milk. *See id.* § 502.091. The State could thus ban the Creamery's use of the words "skim milk" on its illegal product.

However, throughout this proceeding, the State has maintained both that the Creamery's use of the term "skim milk" was speech incident to unlawful conduct *and* that the Creamery's skim milk can be sold under the imitation milk statute. When questioned at oral argument whether an imitation milk permit is even issuable for a milk product such as skim milk, the State conceded it was something of "a square peg in a round hole," but insisted a permit could be issued, refusing to adopt the above argument.

14

imitation milk statute) but do not call it "skim milk;" or (2) call the product "skim milk" but face sanctions for violating Fla. Stat. § 502.091.[11]  The State's action is a speech regulation because the only difference between the two courses of conduct is the speech.  *See Dana's R.R. Supply*, 807 F.3d at 1241–46.  The Creamery's speech "is the only behavior being targeted."  *Id*. at 1249; *see also Abramson v. Gonzalez*, 949 F.2d 1567, 1574 (11th Cir. 1992) ("Clearly the statutes do place restrictions on speech, for apparently *anyone* may currently *practice* psychology . . . in Florida, but only those who have met the examination/academic requirements of the statutes can *say* that they are doing so or hold themselves out as psychologists . . . .").  As a result, the State cannot escape full *Central Hudson* scrutiny by characterizing its restriction as a regulation of speech relating to unlawful conduct because the Creamery's conduct is not unlawful, only its speech is.

---

[11] It should be noted that Florida law does not appear to require the State to prohibit the Creamery from using the term "skim milk;" if an imitation permit is sought, additional disclosure is all that is needed.  *See* Fla. Stat. § 502.181 ("It is unlawful for any person in this state to . . . [a]dvertise, package, label, sell, or offer for sale, or cause to be advertised, packaged, labeled, sold, or offered for sale, any imitation or substitute milk or milk product in a manner that is untrue, deceptive, or misleading and which could cause consumers to think they are purchasing a Grade A milk or milk product.").  This fact underscores that what we decide here is whether the *action* of the State in this case is constitutional.  We make no determination here as to the constitutionality of any statute or regulation.

*2. False or inherently misleading speech*

The remaining focus of our analysis under the threshold question of *Central Hudson* is whether in using the term "skim milk" the Creamery's speech is inherently misleading or merely potentially misleading.[12]  If it is inherently misleading, the speech is not entitled to constitutional protection.  *See Borgner*, 284 F.3d at 1210.  Regulations of speech that is only potentially misleading must pass the three-prong *Central Hudson* test.  *Id*.

The district court held the Creamery's use of the term "skim milk" to describe its product was inherently misleading because it conflicted with the State's definition of "skim milk," according to which the product would include replenished vitamin A.  *See* U.S. Dep't of Health & Human Servs., *Grade "A" Pasteurized Milk Ordinance*, at App'x O (2005) ("[V]itamins A and D must be added to dairy products from which fat has been removed; such as, reduced fat, lowfat, and nonfat dairy products, in an amount necessary to replace the amount of these vitamins lost in the removal of fat.").  The court asserted that "[a] state can recognize—and indeed deliberately create—a standard meaning of a term used to describe a food product, including, in this instance, skim milk."

It is undoubtedly true that a state can propose a definition for a given term.  However, it does not follow that once a state has done so, any use of the term

---

[12] The State does not argue the Creamery's speech is false.

inconsistent with the state's preferred definition is inherently misleading. Such a per se rule would eviscerate *Central Hudson*, rendering all but the threshold question superfluous. All a state would need to do in order to regulate speech would be to redefine the pertinent language in accordance with its regulatory goals. Then, all usage in conflict with the regulatory agenda would be inherently misleading and fail *Central Hudson*'s threshold test. Such reasoning is self-evidently circular, and this Court has already had occasion to refute it.

In *Abramson*, Florida's professional licensure regime permitted the practice of psychology by both licensed and unlicensed professionals, but only allowed those holding licenses to publicly hold themselves out as such. *Abramson*, 949 F.2d at 1572. The defendants there made the same argument the State makes here, namely, that "any commercial speech describing the plaintiffs as psychologists would be false and therefore unprotected by the first amendment since the statute defines a psychologist as someone who is licensed by the state to be a psychologist." *Id.* at 1576. We pointed out the resemblance to *Peel v. Attorney Registration and Disciplinary Commission*, in which the Supreme Court rejected Illinois' identical argument that its definition of the term "specialist" rendered a lawyer's use of the term inherently misleading. *Id.* We explained that "[b]y finding that the attorney in that case could legally hold himself out as a specialist in trial practice, the Court [in *Peel*] necessarily held that the state's own definition of

17

a specialist—or here a psychologist—cannot bar those who truthfully hold themselves out as specialists or psychologists from doing so." *Id.* (citing *Peel v. Att'y Registration and Disciplinary Comm'n*, 496 U.S. 91, 103–105, 110 S. Ct. 2281, 2289–90 (1990) (plurality opinion)). Accordingly, we concluded in *Abramson* that we were "not bound by Florida's definition of a psychologist." *Id.*

The same analysis applies to the State's definition of "skim milk." Indeed, *Peel* indicates that statements of objective fact, such as the Creamery's label, are not inherently misleading absent exceptional circumstances. *Peel*, 496 U.S. at 101–102, 110 S. Ct. at 2288 (concluding the phrase "Certified Civil Trial Specialist" was not inherently misleading in part because "[a] lawyer's certification by NBTA is a verifiable fact, as are the predicate requirements for that certification," though "if the certification had been issued by an organization that had made no inquiry" into the matter, "the statement, even if true, could be misleading"); *see also Ibanez*, 512 U.S. at 144, 114 S. Ct. at 2089 ("[A]s long as Ibanez holds an active CPA license from the Board we cannot imagine how consumers can be misled by her truthful representation to that effect."); *Parker v. Commonwealth of Ky., Bd. of Dentistry*, 818 F.2d 504, 510 (6th Cir. 1987) ("We cannot agree that such terms [as orthodontics, brackets, and braces] are inherently misleading. Such terms are not false, but actually describe procedures which a general practicing dentist is permitted to perform under state law."). Calling the

18

Creamery's product "skim milk" is merely a statement of objective fact. *See, e.g.*, *Skim milk*, Webster's Third New International Dictionary (1986) (defining "skim milk" as "milk from which the cream has been taken").

This is not to say that a state's definition of a term might not become, over time and through popular adoption, the standard meaning of a word, such that usage inconsistent with the statutory definition could indeed be inherently misleading. But the state must present evidence to that effect, and that has not been done here. *See Edenfield*, 507 U.S. at 770–71, 113 S. Ct. at 1800; *Peel*, 496 U.S. at 106, 110 S. Ct. at 2290 ("Given the complete absence of any evidence of deception in the present case, we must reject the contention that petitioner's letterhead is actually misleading."); *Miller*, 117 F.3d at 1382–83 (holding that state had not introduced evidence to show CPA's truthful information was in fact misleading). *But see Zauderer*, 471 U.S. at 652–53, 105 S. Ct. at 2282 (holding that where a contingency fee advertisement stated that "if there is no recovery, no legal fees are owed by our clients," but did not make a distinction between "legal fees" and "costs," state was not required to produce evidence where "the possibility of deception is as self-evident as it is in this case"). To the contrary, the district court went as far as to concede that it "is undoubtedly true that a typical consumer would think 'skim milk' is simply milk from which the cream has been skimmed." Nevertheless, it maintained, the State produced a study in which

19

consumers indicated they would "expect skim milk to include the same vitamin content as whole milk." But this evidence about what consumers believe to be skim milk's attributes does not make the Creamery's representation that it is selling skim milk misleading; "[u]nfamiliarity is not synonymous with misinformation." *Mason*, 208 F.3d at 957. The State's study provides no evidence that consumers expected anything other than skim milk when they read those words on the Creamery's bottles, the State's alternative definition notwithstanding. We are not bound by such a definition. *See Abramson*, 949 F.2d at 1576. The Creamery's use of the words "skim milk" to describe its skim milk is not inherently misleading.

## B. Intermediate Scrutiny

As the Creamery's label does not concern unlawful activity and is not inherently misleading, the Creamery's commercial speech merits First Amendment protection. Accordingly, the State's speech restriction is subject to intermediate scrutiny under the remainder of the *Central Hudson* test.

As to the first prong, the State and the Creamery agree the State has a substantial interest in combating deception and in establishing nutritional standards for milk. We assume, without deciding, that such interests are valid under intermediate scrutiny. In addition, we do not address the second prong of *Central Hudson*, regarding whether the State has shown its restriction directly and

materially advances its interests, because the measure is clearly more extensive than necessary to achieve its goals.

Indeed, the State has introduced no evidence at all on the third prong of *Central Hudson*. The record makes clear that numerous less burdensome alternatives existed and were discussed by the State and the Creamery during negotiations that would have involved additional disclosure without banning the term "skim milk."[13] *See Abramson*, 949 F.2d at 1577 ("[W]hen the first amendment is at issue, 'the preferred remedy is more disclosure, rather than less.'" (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 375, 97 S. Ct. 2691, 2704–2705 (1977))). There can be little question the State failed to show its remedy was "not more extensive than is necessary to serve [its] interest." *Central Hudson*, 447 U.S. at 566, 100 S. Ct. at 2351.

It is true, as the State contends, that the final prong of *Central Hudson* does not require it to show its measure was the least restrictive means of achieving its goal. *See Borgner*, 284 F.3d at 1213 ("We do not require that the regulation at issue be the least restrictive means available to accomplish the state's objective. Rather, we merely require 'a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but

---

[13] For example, the Creamery indicated it was amenable to a label that would have included the following disclaimer: "It [the milk] is all-natural skim milk with some vitamin A removed by skimming cream from milk." *See supra* n.2.

reasonable.'" (quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S. Ct. 3028, 3035 (1989))).  Nevertheless, the State was unable to show that forbidding the Creamery from using the term "skim milk" was reasonable, and not more extensive than necessary to serve its interest.  It "disregard[s] far less restrictive and more precise means"—for example, allowing skim milk to be called what it is and merely requiring a disclosure that it lacks vitamin A.  *Fox*, 492 U.S. at 479, 109 S. Ct. at 3034 (quotation omitted).  The State's mandate was clearly more extensive than necessary to serve its interest in preventing deception and ensuring adequate nutritional standards.

## IV. CONCLUSION

For the foregoing reasons, the State has not carried its burden and is not entitled to summary judgment with respect to its prohibition of the Creamery's use of the term "skim milk."  We therefore **VACATE** the judgment and **REMAND** to the district court.