[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15787
_____

D.C. Docket No. 9:17-cv-80207-RLR

DOUGLAS BOURDON,

Plaintiff-Appellant,

versus

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY (DHS),
JEH CHARLES JOHNSON, Secretary of DHS,
LORETTA LYNCH, Attorney General of
the United States,
UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES (USCIS),
LEON RODRIGUEZ, Director of the USCIS,
TONY BRYSON, District Director,
District 10, USCIS,
LAURA CASTILLO, Acting Field Office Director,
West Palm Beach Field Office, USCIS,

Defendants-Appellees.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 3, 2019)

Before JORDAN, GRANT, and BALDOCK,[*] Circuit Judges.

GRANT, Circuit Judge:

Douglas Bourdon, a United States citizen, sought to bring his wife, a Vietnamese citizen, here to the United States under a program that allows sponsorship of close relatives. But a problem presented itself: Bourdon had been convicted of possession of child pornography, which put him outside the bounds of the visa-sponsorship program unless he could show that he posed no risk to his wife. This he could not do—at least not according to United States Citizenship and Immigration Services, which under a statute known as the Adam Walsh Act has "sole and unreviewable discretion" to determine if citizens like Bourdon pose "no risk" to their foreign relatives. Bourdon sued, alleging that Immigration Services violated the Administrative Procedure Act in two ways: when it used a beyond-a-reasonable-doubt standard rather than a preponderance-of-the-evidence standard to evaluate his petition, and when it did not allow him to offer rebuttal evidence. The district court dismissed the suit, concluding that it had no jurisdiction to review Bourdon's administrative objections to the process behind the no-risk decision. We affirm; courts lack jurisdiction to review either the process or the outcome of the no-risk decision.

I.

We begin by providing a brief background of the immigration procedures and rules at issue. Generally, by filing an I-130 petition, "any citizen of the United

---

[*] Honorable Bobby R. Baldock, Senior United States Circuit Judge for the Tenth Circuit, sitting by designation.

States" can request that the Attorney General recognize a foreign national family member, like a spouse or child, as an "immediate relative." 8 U.S.C. § 1154(a)(1)(A)(i); *see also* 8 C.F.R. § 204.1(a)(1). In response to that request, "the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative," approve the petition. 8 U.S.C. § 1154(b). The foreign national can then enter the United States without regard to numerical limits on immigration. *Id.* § 1151(b).

But Congress created an exception to that allowance in 2006 when it passed the Adam Walsh Child Protection and Safety Act. According to that Act, the general rule permitting a U.S. citizen to petition for foreign family members to receive immediate-relative status does "not apply to a citizen of the United States who has been convicted of a specified offense against a minor, unless the Secretary of Homeland Security, *in the Secretary's sole and unreviewable discretion*, determines that the citizen poses no risk to the alien." *Id.* § 1154(a)(1)(A)(viii)(I) (emphasis added). So the status quo for citizens convicted of specified offenses against a minor—a list that includes kidnapping a child, using a child in a sexual performance, soliciting a child to practice prostitution, and possession of child pornography—is that they are ineligible to sponsor their immediate relative's immigration petition. *See* 34 U.S.C. § 20911(7) (formerly codified at 42 U.S.C. § 16911(7)) (defining "specified offense against a minor"). Unless, that is, the Secretary affirmatively acts in their favor—a task Congress has authorized Immigration Services to perform for the Secretary. *See* 6 U.S.C. § 271(b).

3

Whether the Secretary—or the Secretary's delegate, Immigration Services—will act in favor of the convicted citizens, in turn, is committed to the Secretary's "sole and unreviewable discretion." 8 U.S.C. § 1154(a)(1)(A)(viii)(I).

Turning to the facts here, Bourdon was convicted of possession of child pornography in 2003. Five years later, he married Thi Thuan Tran, a Vietnamese citizen. Shortly after their marriage, Bourdon filed an I-130 petition to establish Tran as his immediate relative so that she could join him in the United States as a legal permanent resident. But Immigration Services told Bourdon that his child-pornography conviction prevented him from filing an I-130 petition—unless he could prove that he posed no risk to his wife. Immigration Services also sent Bourdon a request for evidence regarding his offense and rehabilitation. Bourdon eventually submitted several documents in support of his petition, including an affidavit from his wife; reports from a psychologist and social worker/forensic examiner; and evidence of trips to Vietnam and Thailand to visit his wife.

Immigration Services ultimately denied Bourdon's petition in a written opinion. That opinion—which Immigration Services had no duty to issue—explained that Bourdon had failed to prove "beyond any reasonable doubt" that he posed no risk to his wife. The opinion also stated that Immigration Services found the records that Bourdon submitted of trips to Vietnam and Thailand "disturbing." According to Immigration Services, the records showed that Bourdon repeatedly visited "countries that have literally no child protection laws and where child pornography, child prostitution, and child sex tourism are sources of national income and are tolerated by their respective governments." To support those

4

assertions, the opinion cited to "[c]ountry reports by U.S. Department of State, UNHCR, World Relief, UNICEF, UN-ACT etc."

After receiving the opinion denying his petition, Bourdon brought this action.  Bourdon alleges that Immigration Services violated the APA in two distinct ways when it analyzed whether he posed any risk to his wife.[1]

*First*, Bourdon argues that Immigration Services violated the APA when it applied a beyond-a-reasonable-doubt standard to weigh the evidence that he submitted in support of his petition, rather than the preponderance-of-the-evidence standard that he contends is required under *In re Chawathe*, 25 I. & N. Dec. 369, 375 (USCIS Admin. Appeals Office 2010).  According to *Chawathe*, "[e]xcept where a different standard is specified by law, a petitioner or applicant in administrative immigration proceedings must prove by a preponderance of evidence that he or she is eligible for the benefit sought."  *Id.*  Because the Secretary of Homeland Security designated that decision as precedent, Bourdon argues, Immigration Services is required to abide by it.  *See* 8 C.F.R. § 103.3(c) (administrative decisions designated as precedent "are binding on all Service employees").  And because, Bourdon says, the Adam Walsh Act does not supply a different standard, the agency should have applied a preponderance standard—rather than a beyond-a-reasonable-doubt standard—to weigh the evidence that he presented in support of his application.

---

[1]  The complaint also contained numerous other claims, including alleged constitutional violations, unlawful retroactive application of the Adam Walsh Act, and alleged failure to comply with the APA's notice-and-comment requirement.  The district court dismissed all those claims, and Bourdon does not revisit them here.

5

*Second,* Bourdon alleges that the agency violated the APA because it did not give him the opportunity to inspect and rebut the country reports that the agency cited when it found his travels to Vietnam and Thailand "disturbing." According to Bourdon, 8 C.F.R. § 103.2(b)(16)(i) gives him a right to inspect and rebut any derogatory information that the agency relied on in denying his petition. *Id.* § 103.2(b)(16)(i) ("If the decision will be adverse to the applicant or petitioner and is based on derogatory information considered by the Service and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered . . . .").

These two alleged APA violations, Bourdon argues, survive the Adam Walsh Act's apparent bar on court review because they challenge Immigration Services' compliance with mandatory administrative procedures rather than the agency's ultimate conclusion, which even Bourdon concedes cannot be reviewed. The district court disagreed, and thus dismissed Bourdon's APA claim for lack of subject-matter jurisdiction. *Bourdon v. Sessions*, No. 9:17-CV-80207, 2017 WL 5187833, at *4–5 (S.D. Fla. Nov. 9, 2017). In explaining its decision, the court stated that the statutory scheme shields from judicial review "not only the ultimate determination of whether a petitioner has met his burden of proving 'no risk' to the petition's beneficiary, but also the agency's decision-making process, including what evidence to consider and how to weigh such evidence." *Id.* at *4. The court decided that it was therefore powerless to review the burden of proof that the agency used to weigh the evidence when determining if Bourdon posed no risk to

6

his wife. *Id.* at \*4–5. Likewise, the court concluded that the agency's "unreviewable discretion" over the decision-making process included the agency's failure to allow Bourdon to rebut the country reports that it relied on in denying his petition. *Id.* at \*4. In sum, the court reasoned that Bourdon's attack on the agency's "assessment of the evidence is no less a challenge to" the agency's "discretionary denial of the I-130 than a straightforward challenge to the denial itself, and the Court lacks subject matter jurisdiction to consider an attack from either front." *Id.* at \*4. Bourdon timely appealed the district court's ruling, which we review de novo. *See Perez v. U.S. Bureau of Citizenship & Immigration Servs.*, 774 F.3d 960, 964–65 (11th Cir. 2014) (per curiam).

## II.

We repeat: the Adam Walsh Act gives the Secretary of Homeland Security "sole and unreviewable discretion" to determine whether a citizen like Bourdon poses no risk to his foreign relative. 8 U.S.C. § 1154(a)(1)(A)(viii)(I); *see also* 5 U.S.C. § 701(a)(1) (no APA review of administrative actions when "statutes preclude judicial review"). So the question is whether the processes that Bourdon challenges—the Secretary's chosen burden of proof and the Secretary's denial of an opportunity to rebut derogatory information—fall within the Secretary's unreviewable discretion. If they do, then we are powerless to review Bourdon's APA claim.

## A.

The Adam Walsh Act provides, full stop, that a citizen like Bourdon cannot petition for immediate-relative status "unless the Secretary of Homeland Security,

7

in the Secretary's sole and unreviewable discretion, determines that the citizen poses no risk to the alien." 8 U.S.C. § 1154(a)(1)(A)(viii)(I). The forceful phrase "sole and unreviewable discretion" is the first sign that the Secretary is not bound by otherwise-applicable standards when determining if a citizen poses no risk. "A grant of 'sole' discretion is among the strongest known to the law." *Bremer v. Johnson*, 834 F.3d 925, 931 (8th Cir. 2016). That phrase, in combination with the rest of the statute's text as well as its grammar, its structure, and its history, leads to the conclusion that the Secretary's discretion reaches beyond the final decision to include the Secretary's process for arriving at that decision. Both are therefore shielded from judicial review.

To identify the boundaries of the Secretary's discretion, we begin with the words Congress chose to describe it. The Act gives the Secretary sole and unreviewable discretion to *determine* if a citizen poses a risk, and determine means "establish or ascertain definitely, as after consideration, investigation, or calculation." The American Heritage Dictionary of the English Language 494 (5th ed. 2011); *see also* Webster's New World College Dictionary 402 (5th ed. 2014) ("to reach a decision about after thought and investigation; decide upon"); New Oxford American Dictionary 474 (3d ed. 2010) ("ascertain or establish exactly, typically as a result of research or calculation"). These definitions show that "determine" encompasses making a final decision—*and* the method for reaching that final decision (or, as the dictionaries put it, the thought, consideration, research, investigation, or calculation). So Congress, by choosing the verb "determine"—rather than a noun like "decision" that refers only to the final

8

conclusion—extended the Secretary's discretion to the action of determining rather than only to the final determination.[2]  Moreover, there "is no stark use of indefinite articles in the text to suggest that the grant of discretion is narrowly confined to a single act."  *Bremer*, 834 F.3d at 931.  "Congress's use of the word 'determines' therefore grants the Secretary unreviewable discretion in both concluding that a petitioner poses no risk and the process by which the Secretary reaches this decision."  *Bakran v. Sec'y, U.S. Dep't of Homeland Sec.*, 894 F.3d 557, 563 (3d Cir. 2018).

Even allowing for any definitional ambiguity, both the grammar and the structure of the statute also indicate that the Act prevents courts from reviewing not only the Secretary's final decision but also his decision-making process.  We start with grammar.  Congress chose a grammatical order that makes the Secretary's exercise of his discretion over the decision-making process unreviewable.  "Sole

---

[2] We pause to highlight that the dissent apparently misunderstands our argument, which is not, in fact, built on the "supposed distinction between the words 'determine' and 'decide.'"  Dissenting Op. at 36.  We agree that such a distinction is likely to be illusory, and make no attempt to contrast the verbs "determine" and "decide"—indeed, we have no quarrel with the dissent's conclusion that they are similar in meaning.  But that similarity is meaningless because our textual analysis considers the use of the *verb* "determine" in the Adam Walsh Act rather than the *noun* "decision" that is used in so many other spots to prohibit judicial review of the agency's final outcome.  *See, e.g.*, *infra* page 11 (discussing 8 U.S.C. § 1252(a)(2)(B)(ii)).  This noun-verb distinction is the one that is central to our interpretation of the Adam Walsh Act's text.  So the recitation of dictionary definitions of "decide"—a word that does not appear in the statute— sheds little light on the meaning of the word that does appear in the statute (determines) and even less about the word not used (decision).  The same point applies to the dissent's reliance on *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991).  *See* Dissenting Op. at 38.  That case analyzed the meaning of the word "determination"—a noun that, again, does not appear in the statute we interpret today.  The Eighth Circuit also resisted an improper extension of *McNary* to the Adam Walsh Act, reasoning that "[w]hereas the statute in *McNary* provided that a specific determination could not be reviewed in the district court, the Adam Walsh Act provides that the Secretary's discretion itself is 'sole and unreviewable.'"  *Bremer*, 934 F.3d at 931.

and unreviewable" modifies the word "discretion"—as opposed to "decision" or any other word that would mark the conclusion of the process rather than the process itself. Using common principles of grammar—which we look to because we presume that Congress, in drafting the statute, applied ordinary grammar rules—we can see that the Act is written in a way that makes the Secretary's exercise of his *discretion* over the decision-making process itself unreviewable. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 140 (2012) ("Words are to be given the meaning that proper grammar and usage would assign them."); *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1187–88 (11th Cir. 2001).

The statute's structure reinforces this conclusion. *Cf. Assa'ad v. U.S. Att'y Gen.*, 332 F.3d 1321, 1333–34 (11th Cir. 2003) (looking to a statute's structure to ascertain its meaning). The Act's very starting point demonstrates that the status quo forecloses relief: It entirely bars citizens convicted of specified offenses against a minor from petitioning for immediate-relative recognition. *See* 8 U.S.C. § 1154(a)(1)(A)(viii)(I) ("Clause (i) shall not apply to a citizen of the United States who has been convicted of a specified offense against a minor . . . ."). They are, to put it simply, categorically ineligible for the benefit available to other U.S. citizens. The only possible grace offered from this exclusion is if the Secretary affirmatively acts in favor of the applicant. And any action—or inaction—occurs according to the Secretary's "sole and unreviewable discretion." *Id*.

One other factor informs our view of the statute's meaning: the Adam Walsh Act's history, which confirms that the Act bars judicial review of the Secretary's

10

decision-making process.  Statutory history sheds light on "the context of the statute."  Scalia & Garner, *supra*, at 256.  When analyzing statutory history, we presume that "a change in the language" of a statute, whether by reenactment or amendment, "connotes a change in meaning."  *Id.*  What we can also presume is that the new language means something.  *See id.* at 174 ("If possible, every word and every provision is to be given effect . . . .  None should be ignored.").

Here, the relevant statutory history shows that all U.S. citizens could petition the government to recognize certain family members as immediate relatives until 2006, when Congress passed the Adam Walsh Act.  *See* 8 U.S.C. § 1154(a)(1)(A)(i).  And at the time of the Act's passage, another provision of the Immigration and Nationality Act (INA) already prohibited courts from reviewing any "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."  *Id.* § 1252(a)(2)(B)(ii).  Thus, to bar judicial review of only the Secretary's final decision, rather than the processes behind it, Congress would have simply needed to commit the no-risk decision to the Secretary's discretion so that § 1252 would apply.

But that is not what Congress did.  Instead of making the no-risk *decision* unreviewable, Congress made the exercise of *discretion* itself unreviewable by reserving to the Secretary "sole and unreviewable discretion" to determine whether a citizen posed any risk.  The Adam Walsh Act's language establishes a different meaning than § 1252:  Congress went beyond the existing provision that bars

11

review of all discretionary decisions and instead shielded the Secretary's decision-making process from judicial review.  A more limited interpretation would render the "sole and unreviewable discretion" language entirely duplicative of § 1252(a)(2)(B)(ii).[3]

We note, finally, that our interpretation of the Act aligns with that of every circuit court to have considered the same question—five of our sister circuits have also concluded that courts lack authority to review challenges to the processes that the Secretary uses to determine if a citizen poses no risk.  *See Bakran v. Sec'y, U.S. Dep't of Homeland Sec.*, 894 F.3d 557, 563 (3d Cir. 2018); *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018); *Privett v. Sec'y, Dep't of Homeland Sec.*, 865 F.3d 375, 380–82 (6th Cir. 2017); *Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628–30 (4th Cir. 2017); *Bremer v. Johnson*, 834 F.3d 925, 930–31 (8th Cir. 2016).  Some of these courts reach this conclusion on the basis of the Adam Walsh Act alone, while others consider that Act in combination with § 1252(a)(2)(B)(ii).  But none concludes that the Secretary's decisional process is anything but unreviewable—the same conclusion we adopt here.

## B.

Applying this understanding of the Act to the facts here, we consider Bourdon's arguments.  Bourdon asked the district court to review (1) the Secretary's use of the beyond-a-reasonable-doubt standard to weigh the evidence

---

[3] Indeed, it is not at all clear what the dissent would say the Adam Walsh Act's jurisdiction-stripping language accomplishes that § 1252(a)(2)(B)(ii) does not.  *See* Dissenting Op. at 24, 39 n.3.  The separate opinion offers no interpretation of § 1154(a)(1)(A)(i) that is not entirely duplicative of § 1252(a)(2)(B)(ii), and we cannot discern one.

and (2) the Secretary's refusal to provide Bourdon with an opportunity to respond to the country reports referenced in the opinion rejecting his petition.  He argues that both of those challenges attack the *how* of the Secretary's decision rather than the decision itself.  But that is precisely the point.

As the Board of Immigration Appeals has explained, the "application of the appropriate standard of proof is part and parcel of the ultimate exercise of discretion delegated" to the Secretary.  *In re Aceijas-Quiroz*, 26 I. & N. Dec. 294, 299 (B.I.A. 2014).  And the Secretary's decision not to provide Bourdon with the opportunity to respond to the country reports also falls directly within the Secretary's discretion.  If a court can dictate which arguments the Secretary must entertain or how the Secretary weighs the evidence, then the Secretary can hardly be said to have "sole and unreviewable discretion" to determine if a citizen poses no risk.  That reasoning, plain as it is, shows why both of the challenged processes—the Secretary's preferred burden of proof and the Secretary's refusal to offer an interactive decision-making process—are bound up in the Secretary's "sole and unreviewable discretion."  8 U.S.C. § 1154(a)(1)(A)(viii)(I).

Just how inextricably Bourdon's demands are intertwined with the Secretary's discretion becomes more apparent when his claims are contrasted against Adam Walsh Act claims that other circuits have noted *do not* involve the Secretary's discretion.  One of the courts that refused to review the beyond-a-reasonable-doubt standard still reasoned that the Secretary's discretion would not be implicated by deciding whether a petitioner's offense actually constituted a "specified offense against a minor."  *See Privett*, 865 F.3d at 379.  And others have

likewise stated that a citizen does not challenge the Secretary's discretion when he contends that the Adam Walsh Act does not apply to petitions filed before the Act took effect, or to claims that the Act is impermissibly retroactive. *See Gebhardt*, 879 F.3d at 985–86 (concluding that courts may decide whether the Act applies to already-filed petitions); *Bremer*, 834 F.3d at 929 (whether the Act "is inapplicable" is a legal question "over which the district court has jurisdiction"); *see also Bakran*, 894 F.3d at 564 n.5 ("[W]e are not holding that a court lacks jurisdiction to review an action beyond the authority Congress granted to the agency . . . ."). These are all conditions precedent to the Secretary's discretionary process. We too could conjure up legal claims relating to the Adam Walsh Act that would not imperil its grant of discretion. But Bourdon's challenges go to the heart of the Secretary's decisional process. The district court was therefore correct when it held that the Adam Walsh Act prevented it from reviewing those challenges. So too for this Court.

In reaching this conclusion, we do "not lightly interpret a statute to confer unreviewable power on an administrative agency," *Southern Railway Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 454 (1979), and indeed we "recognize the 'strong presumption' in favor of judicial review that we apply when we interpret statutes." *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016). At the same time, this presumption "is just that—a presumption." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). And, like all other presumptions used in interpreting statutes, it "may be overcome by 'clear and convincing' indications, drawn from 'specific language'" in the statute showing "that Congress

14

intended to bar review." *Cuozzo Speed Techs.*, 136 S. Ct. at 2140 (quoting *Block*, 467 U.S. at 349–50). When Congress commands that we refrain from reviewing a particular administrative decision, we are obligated to follow that statutory limitation rather than defer to our judicial presumptions.

We are, after all, a court of limited jurisdiction whose power to hear cases is defined by Congress: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1; *see also id.* art. III, § 2, cl. 1 (giving federal courts authority to hear cases arising under "the Laws of the United States"). "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). And "the exercise of federal jurisdiction is proper only when prescribed by Congress." *Marshall v. Gibson's Prods., Inc.*, 584 F.2d 668, 672 (5th Cir. 1978). "A corollary to this principle is that Congress may withhold from the federal courts jurisdiction over a class of cases even though the judicial power of the United States, as described in article III, § 2 of the Constitution, includes that class." *Id.* We cannot extend the court's hand to seize topics Congress has put beyond our reach. Indeed, we "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen*, 511 U.S. at 377 (citations omitted).

It is thus no surprise that the Supreme Court has regularly construed statutes to prohibit judicial review of administrative actions—even when the statute lacks any explicit jurisdiction-stripping language and context is the primary indicator of congressional intent to bar judicial review. *See, e.g.*, *Thunder Basin Coal Co. v.*

15

*Reich*, 510 U.S. 200, 207 (1994) (Federal Mine Safety and Health Amendments Act of 1977 bars judicial review of preenforcement challenges to the Act); *Block*, 467 U.S. at 352 ("structure" of the Agricultural Marketing Agreement Act of 1937 "implies that Congress intended to preclude" judicial review of challenges to the Secretary of Agriculture's milk-market orders brought by dairy-product consumers); *S. Ry. Co.*, 442 U.S. at 454–55 (statute barred judicial review of the Interstate Commerce Commission's decision not to investigate a proposed rate increase); *Morris v. Gressette*, 432 U.S. 491, 501 (1977) (under the Voting Rights Act of 1965, courts lack jurisdiction to review Attorney General's failure to object to a change in voting procedures). In passing the Adam Walsh Act, Congress explicitly rendered unreviewable the kind of administrative processes that Bourdon challenges here when it gave the Secretary "sole and unreviewable discretion" to determine if a citizen poses "no risk." Moreover, that express congressional judgment overcomes the "presumption of judicial review" emphasized by the dissent; the command of Congress outweighs a background principle developed by courts to aid in our decisionmaking.[4] As a court of limited jurisdiction, we have no ability to second-guess that judgment.[5]

---

[4] *Abbott Laboratories v. Gardner* is a particularly poor vehicle for the suggestion that we ought to defer to our presumption in favor of judicial review. *See* Dissenting Op. at 39 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). In that decision, the Supreme Court emphasized that "the Government relies on no explicit statutory authority" for its assertion that courts should not review the particular agency decision at issue—a sharp contrast to this case, which centers on the explicit jurisdiction-stripping language in the statute. *Id.* at 141.

[5] The dissent's emphasis on recent judicial and academic criticism of the *Chevron* doctrine is somewhat puzzling, as the foundation of much of that criticism is the idea that courts have

16

C.

Bourdon's arguments against this conclusion do not persuade us.  The first is that he challenges only the agency's deviation from its own regulations governing the process for adjudicating immigration petitions—not the agency's ultimate conclusion that he failed to prove that he posed no risk to his wife.  He insists that the district court had jurisdiction to review his process-based claim because he does not *directly* challenge Immigration Services' denial of his petition.  But as we have said, that argument conflicts with the plain text of the Adam Walsh Act:  The Act's jurisdiction-stripping language embraces both the process and the ultimate no-risk conclusion.  Bourdon cannot overcome the straightforward reading of the Act that its text, grammar, structure, and history demand.

What Bourdon really argues for is an exception to the Secretary's "sole and unreviewable discretion" where a claim alleges that the Secretary violated an administrative regulation.  But the Act does not contain any such exception.  Nor does the statute carve out any limits to the Secretary's absolute discretion (at least as to non-constitutional issues) over how he determines whether a citizen poses "no risk."[6]  No matter how much he urges us to, "we may not engraft our own

allowed agencies to assume legislative and interpretative authority that Congress has not delegated and cannot delegate.  Here, in contrast, we are hewing to Congress's very specific limitation on the authority of the judicial branch; the issues are different in kind.

[6] We do not consider whether the Adam Walsh Act also prohibits judicial review of constitutional claims involving the Secretary's denial of an I-130 petition.  Bourdon's complaint did allege constitutional violations, and the district court dismissed those claims for failure to state a claim.  But Bourdon does not appeal the district court's dismissal of those constitutional claims.  We therefore do not consider or answer that question today, which should ease concerns about the outlandish consequences of this decision suggested by the dissent.  *See* Dissenting Op. at 33–35.  We further note that many of these concerns appear to stem from concessions made by

17

exceptions onto the statutory text." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, No. 17-1272, slip op. at 7 (U.S. Jan. 8, 2019).

Bourdon counters that Congress's use of the expansive language in the Adam Walsh Act was merely an attempt to bar the Board of Immigration Appeals, in addition to Article III courts, from reviewing the Secretary's no-risk decision. We agree that the Act bars both administrative and court review:  "Unreviewable" means that the issue is "[n]ot subject to legal or judicial review."  Black's Law Dictionary 1772 (10th ed. 2009); *see also Aceijas-Quiroz*, 26 I. & N. Dec. at 300 (explaining that the Adam Walsh Act "precludes" the Board of Immigration Appeals from reviewing "both the legal and discretionary aspects of the 'no risk' determination").  But that is not all the Act does.  If Congress merely sought to bar the Board of Immigration Appeals from reviewing no-risk decisions, we cannot see why it would not have said so, rather than cloaking that narrow intent in broad language granting the Secretary "sole and unreviewable discretion" over the question.

Finally, Bourdon appeals to precedent.  He argues that a different outcome is mandated by our previous decision in *Kurapati v. U.S. Bureau of Citizenship &*

---

the advocate for the Government at oral argument—who, deviating from the position made in the Government's briefs, suggested, as the dissent notes, that the Adam Walsh Act's bar on judicial review applies only when "all the procedures are complied with."  *See id.* at 11–12.  But we, of course, are "not bound to accept the Government's concession."  *Orloff v. Willoughby*, 345 U.S. 83, 87 (1953).  The "role of the judicial branch is to apply statutory language" and we cannot "cede our authority to interpret statutes to the parties or their attorneys."  *Harris v. Garner,* 216 F.3d 970, 976 (11th Cir. 2000); *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1255 (11th Cir. 2015) (Carnes, C.J., dissenting).  In short, the Government cannot concede away the proper interpretation of a statute, and its willingness to veer from its earlier adherence to the text of the Adam Walsh Act does not give us license to do the same.

18

*Immigration Services*, where we stated:  "Even when a *decision* is committed to agency discretion, a court may consider allegations that an agency failed to follow its own binding regulations."  775 F.3d 1255, 1262 (11th Cir. 2014) (per curiam) (emphasis added) (citation omitted).  Bourdon argues that under *Kurapati*, we should review his allegations that the Secretary failed to comply with administrative regulations when it denied his I-130 petition.  But that would require us to extend *Kurapati*'s holding to a different statutory provision with different jurisdiction-stripping language.  Given what we understand about the meaning of the Adam Walsh Act after our extensive consideration of its text, we cannot supplant our conclusions with an earlier interpretation of a *different* statute as applied to yet another statute.

And that is, after all, what *Kurapati* interpreted.  As the Second Circuit correctly pointed out, *Kurapati* concerned whether courts may review the Secretary's compliance with various administrative regulations when the Secretary revokes an I-140 petition for a work visa under the authority of 8 U.S.C. § 1155. *See Mantena v. Johnson*, 809 F.3d 721, 729 (2d Cir. 2015).  That statute provides that the Secretary of Homeland Security "may, at any time, for what he deems to be good and sufficient cause, revoke the approval of" certain immigration petitions, including I-140 petitions for work visas.  8 U.S.C. § 1155.

As we have already described, the general jurisdiction-stripping provision of the INA, § 1252, provides that "no court shall have jurisdiction to review" any "decision or action" of the Secretary "the authority for which is specified under this subchapter to be in the discretion" of the Secretary.  *Id.* § 1252(a)(2)(B).

19

Section 1155 thus commits to the Secretary's discretion the *decision* to revoke a work visa. And § 1252 shields that *decision* from judicial review. We therefore recognized in *Kurapati* that because § 1252 only prohibits judicial review of an agency's "decision or action," courts retain jurisdiction to review allegations that an agency failed to follow binding administrative regulations in revoking a work visa—jurisdiction was only barred for the ultimate *decision* regarding the visa. *Kurapati*, 775 F.3d at 1262.

*Kurapati* did not make any mention of the provision of the Adam Walsh Act at issue here (which, as we have seen, contains its own jurisdiction-stripping provision separate from § 1252), and for good reason—the Adam Walsh Act was not at issue. Because *Kurapati* concerned the application of § 1252—and only § 1252—to a different statute, our holding there does not control the outcome here. *See* Bryan A. Garner et al., *The Law of Judicial Precedent* 343 (2016).

If *Kurapati* did apply, we would of course be bound by its outcome. But "[o]ne important thing to remember is that stare decisis doesn't apply to statutory interpretation unless the statute being interpreted is the same one that was being interpreted in the earlier case." *Id.* Nor is a case "binding precedent" on points that were "not there raised in briefs or argument nor discussed in the opinion." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952); *cf. In re Bradford*, 830 F.3d 1273, 1278 (11th Cir. 2016) (per curiam) ("[W]hen it comes to questions of jurisdiction, we are bound only by explicit holdings."); *Rosenberg v. DVI Receivables XIV, LLC*, 818 F.3d 1283, 1289 (11th Cir. 2016) (rejecting an out-of-circuit opinion because "there is no indication that the parties urged or that

20

the court even considered" the question presented).  Because *Kurapati* did not interpret the statute at issue here, it comes as no surprise that it is not binding here. So while § 1252, standing alone, permits judicial review of "allegations that an agency failed to follow its own binding regulations," the particular language of the Adam Walsh Act bars judicial review of the Secretary's compliance—or lack of compliance—with administrative regulations.  *See Kurapati*, 775 F.3d at 1262 (internal quotation marks and citation omitted).[7]

So too for the cases cited by the dissent.  *See Service v. Dulles*, 354 U.S. 363 (1957); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 262–63 (1954).  Neither of the Supreme Court cases relied on by the dissent involve a statute containing *any* jurisdiction-stripping language—much less the strong language in the Adam Walsh Act—but instead simply involved review of statutes that provide discretion.  *See Service*, 354 U.S. at 373 (reviewing action taken, in part, under a statutory grant of "absolute discretion" to terminate employment); *Accardi*, 347 U.S. at 262–63 (reviewing action taken under a statute providing, in relevant part, that the "the Attorney General may suspend deportation of such alien").  The key word missing from these statutes is "unreviewable."  Supreme Court cases reviewing the discretion of Executive Branch officials cannot guide us in cases, like this one, where we are told by Congress not to review that discretion in the first place.

---

[7] We do not mean to suggest that our reasoning in *Kurapati* cannot apply to any other contexts, beyond the work-visa one considered in *Kurapati*; we hold only that the rationale cannot extend to this situation because the Adam Walsh Act shields the Secretary's decision-making process from judicial review.  *See, e.g.*, *Romano-Murphy v. Comm'r of the IRS*, 816 F.3d 707, 718 (11th Cir. 2016) (citing *Kurapati* in stating that the IRS must follow treasury regulations).

*    *    *

In sum, the Secretary enjoys "sole and unreviewable discretion" to set the burden of proof and to give—or not give—citizens the opportunity to rebut derogatory information. The Adam Walsh Act prevents us from reviewing how the Secretary chooses to exercise his discretion, and nothing in *Kurapati* mandates a different result.

The district court correctly held that the Adam Walsh Act prevented it from exercising jurisdiction over Bourdon's APA claim. We therefore **AFFIRM** its judgment.

JORDAN, Circuit Judge, dissenting:

In *Kurapati v. U.S. Bureau of Citizenship & Immigration Servs.*, 775 F.3d 1255, 1262 (11th Cir. 2014) (on rehearing), the plaintiff filed a complaint challenging USCIS' revocation of an I-140 immigrant work visa petition that had been filed on his behalf. The government argued that subject-matter jurisdiction did not exist because the revocation decision was committed to the discretion of the Secretary of Homeland Security, *see* 8 U.S.C. § 1155, and a separate provision of the Immigration and Nationality Act, 8 U.S.C. § 1252(a)(2)(B)(ii), deprived district courts of jurisdiction to review any "decision or action of . . . the Secretary . . . the authority for which is specified . . . to be in the discretion of . . . the Secretary."

We rejected the government's jurisdictional argument because the plaintiff's challenge was not to the revocation itself, but rather to USCIS' failure to comply with the applicable administrative procedures in revoking the petition. Adopting the reasoning of *Bonillo v. Secretary, U.S. Dep't of Homeland Security*, 497 F. App'x 913, 915–16 (11th Cir. 2012), we explained that there is a difference between "judicial review of the I-140 revocation and judicial review of whether the agency complied with the applicable administrative procedure in revoking the I-140," and held that § 1252(a)(2)(B)(ii) "did not divest the district court of jurisdiction to consider the latter." *Kurapati*, 775 F.3d at 1262. "'Even when a decision is committed to agency discretion, a court may consider allegations that an agency

23

failed to follow its own binding regulations.'"  *Id.* (quoting *Fla. Dep't of Bus. Regulation v. U.S. Dep't of Interior*, 768 F.2d 1248, 1257 n.11 (11th Cir. 1985)).

In this case, USCIS determined that Mr. Bourdon had not shown beyond a reasonable doubt that he posed "no risk" to his Vietnamese wife, whom he sought to sponsor and bring to the United States.  Based upon that determination, it denied his I-130 petition.  Mr. Bourdon alleges in his complaint that USCIS improperly applied a beyond-a-reasonable-doubt standard when its own rules and precedent mandate a preponderance-of-the-evidence standard.  In other words, like the plaintiff in *Kurapati*, Mr. Bourdon is challenging USCIS' failure to comply with the applicable administrative procedures, and not its ultimate factual determination.  The government, as it did in *Kurapati*, argues that there is no subject-matter jurisdiction because the "no risk" determination is committed to the "sole and unreviewable discretion" of the Secretary of Homeland Security under 8 U.S.C. § 1154(a)(1)(A)(viii)(I), a provision of the Adam Walsh Act, and is therefore not subject to judicial review under § 1252(a)(2)(B)(ii).  *See* Br. for Appellee at 12–14.

The result here, as in *Kurapati*, should be that jurisdiction exists notwithstanding §§ 1154(a)(1)(A)(viii)(I) and 1252(a)(2)(B)(ii).  Those provisions, as was the case in *Kurapati*, only preclude substantive review of the ultimate and discretionary I-130 denial, and here Mr. Bourdon is challenging not the denial but

24

USCIS' failure to comply with its own governing procedures (i.e., the preponderance-of-the-evidence standard) in reaching its "no risk" determination.

Our analysis about subject-matter jurisdiction should begin and end with *Kurapati*. Because "the law of precedent teaches that like cases should generally be treated alike," *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018), I respectfully dissent from the majority's effort to avoid the reach of *Kurapati* (and, as I explain, Supreme Court cases like it).

## I

To succeed on his I-130 petition, Mr. Bourdon—who was convicted of possessing child pornography in 2003—had to show that he posed "no risk" to his wife. But § 1154(a)(1)(A)(viii)(I) is silent on the burden of proof that Mr. Bourdon had to satisfy in making this showing. That provision does not tell us whether the standard is substantial evidence, preponderance of the evidence, clear and convincing evidence, proof beyond a reasonable doubt, or something else.

Pursuant to its own regulations, USCIS is bound by published, precedent-setting opinions issued by the Board of Immigration Appeals. *See* 8 C.F.R. § 103.3(c) ("Except as these decisions may be modified or overruled by later precedential decisions, they are binding on all Service employees in the administration of the [INA]."). *See also I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999) (explaining that BIA adjudications are entitled to *Chevron* deference

25

based on the Attorney General's delegation of authority to the BIA under 8 C.F.R. § 3.1(d)(1)).  In 2010, the BIA issued a published decision that made preponderance of the evidence the generally applicable standard in situations where the evidentiary standard is not set out in a statute or regulation: "Except where a different standard is specified by law, a petitioner or applicant in administrative immigration proceedings must prove by a preponderance of evidence that he or she is eligible for the benefit sought."  *Matter of Chawathe*, 25 I. & N. Dec. 369, 375 (B.I.A. 2010).  As an example of what "specified by law" means, *Chawathe* cited *Matter of Patel*, 19 I. & N. Dec. 774, 782 (B.I.A. 1988), where the statute at issue, 8 U.S.C. § 1154(a)(2)(A)(ii), required that "the alien establish[ ] to the satisfaction of the Attorney General by clear and convincing evidence that the prior marriage . . . was not entered into for the purpose of evading any provision of the immigration laws."

Here, as noted, § 1154(a)(1)(A)(viii)(I) does not specify any evidentiary standard whatsoever.  Under *Chawathe*, then, USCIS was obligated to use the preponderance-of-the-evidence standard to determine whether Mr. Bourdon had shown that he posed "no risk" to his wife.  But instead USCIS did what it was not permitted to do—it required Mr. Bourdon to satisfy the much higher beyond-a-reasonable-doubt standard.  The question for us is whether a federal court can review USCIS' refusal to adhere to its own governing rules and precedent.  The answer is a resounding yes.

## II

In *Kurapati*, 775 F.3d at 1262, we rejected the government's argument that §§ 1155 and 1252(a)(2)(B)(ii), individually or in tandem, precluded judicial review of a claim that USCIS failed to follow governing administrative procedures. Our rationale was broad and not limited to or dependent on these two specific statutory provisions. Indeed, the main published case on which we relied, *Fla. Dep't of Bus. Regulation*, did not concern any provisions of the INA.

## A

*Fla. Dep't of Bus. Regulation*, 768 F.2d at 1256–57, involved a challenge to a decision by the Secretary of the Interior to acquire land in trust for the Seminole Indian Tribe, and his alleged failure to follow certain regulations establishing several factors that normally would guide his decision. The statute at issue, the former 25 U.S.C. § 465, stated that the Secretary was "authorized, in his discretion, to acquire . . . any interest in lands . . . for the purpose of providing land for Indians." Although we explained that the "decision to acquire the land [wa]s unreviewable as within [the Secretary's] discretion," we squarely addressed the appellant's argument that the Secretary had failed to comply with several regulations in exercising his discretion. *See id.* at 1256–57. We ruled that "[e]ven when a decision is committed to agency discretion, a court may consider allegations that an agency failed to follow its own binding regulations." *Id.* at 1257 n.11.

27

The principle of judicial review we applied in *Fla. Dep't of Bus. Regulation* and *Kurapati* makes sense. After all, "[i]t is a familiar rule of administrative law that an agency must abide by its own regulations." *Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990). *See also* 32 Charles A. Wright, Charles H. Koch, Jr., & Richard Murphy, Fed. Practice & Procedure, § 8165 (1st ed. 2019) ("One of the most firmly established principles in administrative law is that an agency must obey its own rules."). *Kurapati*, in my view, controls the outcome here. *See United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("The holding of a case comprises both the result of the case and those portions of the opinion necessary to that result.") (internal quotations omitted).

Even if we focus on immigration, this principle of judicial review applies in that sphere as well. Here is what we said as an en banc court more than three decades ago: "That the authority of the political branches in this area [of immigration] is plenary does not mean that it is wholly immune from judicial review. . . . [T]he Executive's discretionary authority concerning parole decisions [for aliens] is 'broad but not unlimited. It may be subjected to judicial scrutiny on a charge that discretion was arbitrarily exercised or withheld." *Jean v. Nelson*, 727 F.2d 957, 975 (11th Cir. 1984) (en banc) (internal quotations marks and citation omitted), *aff'd*, 472 U.S. 846 (1985).

**B**

The majority concludes that § 1154(a)(1)(A)(viii)(I) requires a different outcome because it leaves the "no risk" determination to the "sole and unreviewable discretion" of the Secretary. That conclusion, however, is inconsistent with Supreme Court precedent.

In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 261 (1954), the Supreme Court addressed the Attorney General's discretion to suspend the deportation of certain immigrants who had "proved good moral character." The Court acknowledged that the relevant statute granted broad discretion to the Attorney General, which he had delegated to a board. *Id.* at 267. But the Attorney General had set forth certain procedures for the exercise of that discretion, and having done so, he could not claw back that discretion unilaterally in particular cases. *Id.* at 268. The Court emphasized (as we did in *Fla. Dep't of Bus. Regulation* and *Kurapati* many decades later) the difference between judicial review to ensure that an agency has complied with its own rules (which is appropriate) and judicial review of the substance of a decision committed to agency discretion (which is generally not permitted): "It is important to emphasize that we are not here reviewing and reversing the *manner* in which discretion was exercised. . . . Rather, we object to the Board's alleged *failure to exercise* its own discretion, contrary to existing valid regulations." *Id.* at 268 (emphasis in original).

29

Three years after *Accardi*, the Supreme Court decided *Service v. Dulles*, 354 U.S. 363 (1957). That case involved the termination of a State Department employee by the Secretary of State under a statute (the so-called McCarran Rider) which stated that, "[n]otwithstanding the provisions of . . . any other law, the Secretary of State may, *in his absolute discretion*, . . . terminate the employment of any officer or employee of the Department of State or of the Foreign Service . . . whenever he shall deem such termination necessary or advisable in the interests of the United States[.]" *Id.* at 370 (emphasis added and internal quotation marks omitted).

The employee had received a favorable decision from a State Department administrative board, which found that (a) reasonable grounds did not exist to believe that he was disloyal to the United States, and (b) he did not constitute a security risk. *See id.* at 366. These finding were approved by the Deputy Under Secretary of State pursuant to the authority delegated to him by the Secretary. *See id.* On a "post-audit," however, the Civil Service Commission Loyalty Review Board remanded the case to the State Department administrative board. But the result was the same: the administrative board again ruled in favor of the employee, and the Deputy Under Secretary of State again approved that determination. *See id.* On a further "post-audit," the Loyalty Review Board decided to conduct a new hearing itself, after which it found that there was reasonable doubt about the employee's loyalty. The Loyalty Review Board advised the Secretary that in its

30

opinion the employee should be removed from the Department of State. *Id.* at 366–67.

The Secretary then discharged the employee. In his affidavit, the Secretary stated that, pursuant to the McCarran Rider and other regulations and executive orders, he had "made a determination to terminate the services" of the employee. He also explained that he had acted solely as the result of the finding of the Loyalty Review Board, which he considered to be "merely an advisory recommendation"; that he had not made any independent determination on his own as to whether the evidence demonstrated a reasonable doubt about the employee's loyalty and had made no independent judgment on the record; and that he had been "legally free to exercise [his] own judgment as to whether [the employee] should be terminated and [he] did so exercise that judgment." *Id.* at 369.[1]

Despite the "in his absolute discretion" language in the McCarran Rider, the Supreme Court applied *Accardi* and addressed the employee's contention that the Secretary, in reaching his decision, had violated applicable State Department regulations. The Court explained that it was "not . . . concerned in any wise with the merits of the Secretary's action in terminating the [employee's] employment," and was reviewing only "the manner of [the employee's] discharge." *Id.* at 373, 382. It

---

[1] Although the Secretary had, as noted, purported to act pursuant to the McCarran Rider and certain other regulations and executive orders, the Supreme Court explained that only the McCarran Rider gave the Secretary the power to terminate the employee in question. *See id.* at 371 n.12.

31

then set aside the termination decision because the Secretary had indeed violated the applicable 1949 and 1951 regulations.

As the Supreme Court read the 1949 regulations, the Secretary would only have opportunity to act if a board and the Deputy Under Secretary of State ruled against the employee and the employee then appealed to the Secretary. If the board ruled for the employee and the Deputy Under Secretary of State agreed with that favorable decision, the matter did not reach the Secretary. *See id.* at 383–85 (discussing and explaining the 1949 regulations). In the case before it, the employee had prevailed before both the administrative board and the Deputy Under Secretary of State, and as a result the Secretary could not render his own termination decision: "So here when the Deputy Under Secretary approved the [administrative board's] action of July 31, 1951, clearing the employee, under these [r]egulations the case was closed. Hence [the employee's] subsequent discharge by the Secretary must be deemed to have been in contravention of the . . . [r]egulations." *Id.* at 386.[2]

With respect to the 1951 regulations, the Court also found a violation. Those regulations required the Secretary to base his decision on all of the evidence and after consideration of the complete file, arguments, briefs, and testimony presented.

---

[2] There was one other way for the Secretary to act outside of the 1949 regulations, but that avenue was not at issue in the case. *See id.* at 385 ("[T]he Secretary reserved the right to deal with such a case under his McCarran Rider authority, outside the [r]egulations, only in instances where, upon an employee's appeal to the Loyalty Review Board from an unfavorable decision by the Secretary, the decision of that body was favorable to the employee.").

32

*See id.* at 388. In other words, the "Secretary's decision was required to be on the merits." *Id.* As long as those regulations "remained unchanged," the Secretary could not "proceed without regard to them." *Id.* Because the Secretary had not made an independent judgment based on the full record, he had acted in violation of the regulations. *See id.*

If the "in his absolute discretion" language did not bar review of the Secretary's failure to follow applicable regulations in *Service*, the "sole and unreviewable discretion" language here does not bar Mr. Bourdon's claim that USCIS failed to follow the BIA's binding decision in *Chawathe.*

## C

Under the majority's theory of "sole and unreviewable" discretion, federal courts are barred from reviewing anything that touches on "the heart of the Secretary's decisional process." But if the majority is right, then USCIS can decide to deny all I-130 applications that are filed on a given day of a week, or all that are filed by persons with last names that begin with the letter "M," or all that are filed by persons who make minimum wage, or all those that are filed by persons with red hair, or all that are filed by persons who are from certain states. Or it can make its "no risk" decisions by tossing a coin. After all, each of those bases—no matter how arbitrary and illegitimate—would undoubtedly be part of USCIS' "decisional

33

process."   The majority's rationale—which does not explain how such arbitrary determinations would be reviewable—is as untenable as it is unwise.

Apparently recognizing this problem, the government made a number of fatal concessions at oral argument.  First, the government conceded that USCIS' decision is reviewable to ensure that the proper process was followed:

> The Court: Sole and unreviewable means sole and unreviewable . . . only when—finish the sentence.

> Government: Only when, well I think—it's sole and unreviewable when all the procedures are complied with.

Second, the government conceded that if a statute set out preponderance of the evidence as the governing standard for I-130 applications, then USCIS' use of a beyond-a-reasonable-doubt standard would be reviewable.  Third, the government conceded that if USCIS chose to deny all I-130 applications that were filed on Tuesdays, those arbitrary denials would be reviewable.  These concessions doom the government's jurisdictional position, for if the scenarios summarized above permit judicial review, then there is no bar to review here to ensure procedural regularity.

The majority correctly notes that we do not have to accept the government's concessions, but it fails to explain why those concessions are not appropriate.  If the majority's analysis and holding are correct, any "no risk" determination by USCIS— no matter how arbitrary the underlying basis—is unreviewable.  The majority refuses to acknowledge this undeniable point, calling such consequences "outlandish" and

34

taking comfort in Mr. Bourdon's failure to advance any constitutional claims on appeal. That comfort, in my view, is misplaced. First, under our prior panel precedent rule, a statutory interpretation decision like this one constitutes binding authority even if certain arguments were not made or considered by the panel. *See, e.g., Tippit v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1234 (11th Cir. 2006); *Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001). As a result, the majority's statutory ruling—which does not contain any limiting principle—will be binding on future panels even if the litigants in subsequent cases advance constitutional arguments. Second, "[i]t is . . . well established that it is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards to persons involved in adjudicative processes before it." *Government of Canal Zone v. Brooks*, 427 F.2d 346, 347 (5th Cir. 1970). If the majority's holding means that arbitrary I-130 "no risk" determinations would be unreviewable, then the canon of constitutional avoidance should kick in. *See generally Jennings v. Rodriguez*, 138 S.Ct. 830, 842 (2018) (discussing the canon of constitutional avoidance).

## III

Even if cases like *Kurapati* and *Service* did not exist, we would still have jurisdiction to address Mr. Bourdon's claim that USCIS applied a standard of proof which was higher than, and which contravened, governing BIA precedent. The

35

Secretary undeniably has "sole and unreviewable discretion . . . [to] determine[ ] that the citizen poses no risk to the alien." § 1154(a)(1)(A)(viii)(I).  Although this language forecloses review of USCIS' ultimate conclusion about whether Mr. Bourdon poses "no risk" to his wife, it does not bar jurisdiction to review the procedures used to come to that determination.

The majority builds its statutory argument on the supposed distinction between the words "determine" and "decide."  The syllogism goes something like this: (1) "determine" refers to the entire decision-making process; (2) "decide" only refers to the final conclusion; and (3) as a result, Congress' choice of the word "determines" in § 1154(a)(1)(A)(viii)(I) deprives a person like Mr. Bourdon of judicial review over every component of the I-130 decisional process.  But the syllogism falls apart because the majority's lexicographic distinction does not exist. Dictionaries at the time § 1154(a)(1)(A)(viii)(I) was enacted reveal that "determine" and "decide" each mean the same thing.

Many respected dictionaries circa 2006 provide the same (or very similar) definitions of "decide" and "determine" and use the words interchangeably to mean the adjudication of a disputed matter.  Here are a few of them.  *See* 2 Shorter Oxford Dictionary of the English Language 615, 659 (5th ed. 2002) (defining "decide" as to "[s]ettle a question in a dispute; pronounce judgment," and "determine" as to "[s]ettle or decide (a dispute, controversy, etc., or a sentence, conclusion, issue, etc.)

36

as a judge or arbiter"); Webster's Third New International Dictionary 585, 616 (2002) (defining "decide" as "to make a choice or decision esp. a binding or definitive one presumably after consideration," and "determine" as "to fix conclusively or authoritatively"); American Heritage Dictionary of the English Language 470, 495 (4th ed. 2009) (defining "decide" as "[t]o settle conclusively all contention or uncertainty about: *decide a* case," and "determine" as "[t]o decide or settle a dispute, for example, conclusively and authoritatively"); Black's Law Dictionary 436, 480 (8th ed. 2004) (defining "decision" as "[a] judicial or agency determination after consideration of the facts and the law," and "determination" as "[a] final decision by a court or administrative agency").

So, if "determine" encompasses the entire decisional process, then so does "decide." The words are synonyms, and they both mean "to come to a decision." American Heritage Dictionary of the English Language 359 (4th ed. 2009). And, contrary to the majority's assertion, the meaning of these words does not change when they are used as nouns or verbs. Tellingly, the majority fails to cite a single case (or other authority) to support its assertion that Congress uses the noun "decision" in some artificially narrow sense to refer to the final outcome, but that the verb "determine" means more than its dictionary definition. In fact, to the extent that the words have different meanings, the difference between them is the opposite of what the majority suggests. As it turns out, "decide" is broader than "determine."

37

*See id.* ("*Decide* is the least specific: '*If two laws conflict with each other, the courts must decide on the operation of each[.]*' *Determine* often involves somewhat narrower issues: *A jury will determine the verdict*.") (emphases in original).

Moreover, the Supreme Court analyzed the meaning of "determination" in a similar context and came to the opposite conclusion as the majority. In *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), the Supreme Court held that a statutory bar on judicial review "of a determination respecting an application" did not foreclose review of "collateral challenges" to an agency's procedures. *Id.* at 492. The Court observed that "a determination" referenced "a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.*

Once we understand that "determine" refers to an ultimate adjudication, the use of that word in § 1154(a)(1)(A)(viii)(I) does not support the majority's conclusion. The Secretary has "sole and unreviewable discretion," but this language tells us nothing in isolation. We need to know what the Secretary has discretion to do, and in this context, the Secretary has discretion to *make a "no risk" determination*. Congress could have used broader language, for example granting the Secretary "sole and unreviewable authority over all issues and matters pertaining to such visa applicants," but it did not. Congress instead granted unreviewable discretion only as to the Secretary's ultimate "no risk" determinations, and we are

38

not at liberty to add words to § 1154(a)(1)(A)(viii)(I).  *See Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009).[3]

Finally, even if all of this brought us only to statutory equipoise, there is a "basic presumption of judicial review" of administrative action, as explained in cases like *Abbott Labs v. Gardner*, 387 U.S. 136, 140 (1967).  To overcome this presumption, the government must show by "clear and convincing evidence" that Congress intended otherwise.  *Id.* at 141.  This standard is a "useful reminder" that "the general presumption favoring judicial review of administrative action is controlling."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 350–51 (1984).  As Chief Justice Marshall noted in *United States v. Nourse*, 34 U.S. (9 Pet.) 8, 28–29 (1835):

> It would excite some surprise if, in a government of laws and of principle, furnished with a department whose appropriate duty it is to decide questions of right, not only between individuals, but between the government and individuals; a ministerial officer might, at his

---

[3] The majority argues that its statutory reading must be correct because I "offer[ ] no interpretation of § 1154(a)(1)(A)(viii)(I) that is not entirely duplicative of § 1252(a)(2)(B)(ii)."  But the canon against surplusage has real force only when a court interprets two provisions of the same statute. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part *of the same statutory scheme*.") (emphasis added); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of *that same law*.") (emphasis added).  This makes sense because the canon reflects our assumption that the Congress that wrote a law intended every word in it to have meaning.  That assumption is not as strong when laws are enacted at different times.  The Immigration and Nationality Act was enacted in 1952, and most recently amended in 2005.  *See* REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231.  The Adam Walsh Act was not signed into law until 2006.  So the canon of surplusage tells us little about how to interpret these two statutes.  And even if we assumed that they were part of the same statutory *scheme*, "[r]edundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws . . . a court must give effect to both."  *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) (internal citation omitted).

discretion, issue this powerful process . . . leaving to the debtor no remedy, no appeal to the laws of his country, if he should believe the claim to be unjust. But this anomaly does not exist; this imputation cannot be cast on the legislature of the United States.

The government has not presented clear and convincing evidence to completely overcome the presumption of judicial review, and today's decision unfortunately creates the anomaly Chief Justice Marshall once thought was impossible.

## IV

The majority notes that its decision is consistent with cases decided by a number of other circuits. That is undeniably true, but those other cases do not provide the majority much support.

Let's start with *Roland v. U.S. Bureau of Citizenship & Immigration Servs.*, 850 F.3d 625 (4th Cir. 2017), *Privett v. Secretary*, 865 F.3d 375 (6th Cir. 2017), and *Bakran v. Secretary*, 894 F.3d 557 (3d Cir. 2018). In those cases, the Fourth, Sixth, and Third Circuits held that USCIS' use of the beyond-a-reasonable-doubt standard was not subject to judicial review, but they relied on § 1252(a)(2)(B)(ii), and not on § 1154(a)(1)(A)(viii)(I), to do so. *See Roland*, 850 F.3d at 630; *Privett*, 865 F.3d at 380–81; *Bakran*, 894 F.3d at 563. In *Kurapati*, as noted earlier, we rejected the § 1252(a)(2)(B)(ii) rationale, so the analytical underpinnings of *Roland*, *Privett*, and *Bakran* do not move the needle here. The decisions of other circuits, whether or not persuasive, simply cannot supplant Eleventh Circuit precedent like *Kurapati. See Generali v. D'Amico*, 766 F.2d 485, 489 (11th Cir. 1985).

40

The other two cases, *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018), and *Bremer v. Johnson*, 834 F.3d 925, 930–31 (8th Cir. 2016), rely on § 1154(a)(1)(A)(viii)(I) just like the majority does here.  But in those cases, the Eighth and Ninth Circuits did not discuss the Supreme Court's decisions in cases like *Service*, 354 U.S. at 386–88, which holds that even where an ultimate decision or determination is left to the "absolute discretion" of an agency or official, judicial review remains available to ensure that the appropriate procedures have been observed.  Without any explanation as to why *Service* does not govern, *Gebhardt* and *Bremer* lack persuasive force.

*Gebhardt*, moreover, did not address the BIA's decision in *Chawathe*, 25 I. & N. Dec. at 375.  Although *Bremer* acknowledged *Chawathe*, it did so in addressing the merits, holding that *Chawathe* did not apply because § 1154(a)(1)(A)(viii)(I) "allows for a different standard of proof."  *Bremer*, 834 F.3d at 931.  The Eighth Circuit could decide the applicability of *Chawathe* only if it had jurisdiction to address the merits of the claimant's procedural argument—jurisdiction that the majority disclaims here.  So in the end *Bremer* proves difficult for the majority's jurisdictional holding.[4]

---

[4] Like the Eighth Circuit in *Bremer*, the government alternatively argues that the "no risk" language in § 1154(a)(1)(A)(viii)(I) permits (and even demands) a higher standard of proof than preponderance of the evidence.  *See* Br. for Appellee at 15–16.  That argument, however, goes to the merits of Mr. Bourdon's challenge, and not to jurisdiction.  On the merits, I do not think the government is correct.  Nothing in § 1154(a)(1)(A)(viii)(I) alludes to any particular standard of

## V

Because § 1154(a)(1)(A)(viii)(I) is silent as to the standard by which an I-130 applicant has to show that he poses "no risk" to the relative he seeks to bring to the United States, Mr. Bourdon had to make that showing by a preponderance of the evidence under the BIA's binding decision in *Chawathe*. USCIS, however, ignored *Chawathe* and required Mr. Bourdon to make this showing beyond a reasonable doubt. Despite our governing precedent in *Kurapati*, and notwithstanding Supreme Court cases like *Service*, the majority holds that USCIS' significant procedural error cannot be reviewed by a federal court. Because USCIS, "like all other decisionmaking tribunals, is obliged to follow its own [r]ules," *Ballard v. Comm'r*, 544 U.S. 40, 42 (2005), I respectfully dissent.[5]

---

proof, and preponderance of the evidence is the default benchmark that USCIS has set for itself through *Chawathe*. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."). But even if the government is right (and I am wrong) about the inapplicability of *Chawathe* to § 1154(a)(1)(A)(viii)(I), that means that it should prevail on the merits, and not because judicial review is barred.

[5] Many prominent voices have recently challenged judicial deference to agencies as undemocratic and unconstitutional. *See e.g.*, *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1213 (2015) (Thomas, J., concurring in the judgment) (contending that such deference "undermines our obligation to provide a judicial check on the other branches, and it subjects regulated parties to precisely the abuses that the Framers sought to prevent"); Abbe R. Gluck & Richard A. Posner, *Statutory Interpretation on the Bench: A Survey of Forty-Two Judges on the Federal Courts of Appeals*, 131 Harv. L. Rev. 1298, 1349 (2018) ("We note that *Chevron* has come under more academic and judicial attack recently."). But at least the framework of deference permits some review of agency action by courts. Today's result completely insulates from judicial review USCIS' refusal to follow its own rules and the BIA's binding precedent.